UNITED STATES of America, Appellee,

v.

Phillip Dale VAN SCOY, Appellant.

No. 80–1631.

United States Court of Appeals,
Third Circuit.

Argued Feb. 24, 1981.
Decided June 22, 1981.

Clifford A. Rieders (Argued), Stuart, Murphy, Smith, Mussina, Harris & Rieders, Williamsport, Pa., for appellant Phillip Dale Van Scoy.

Carlon M. O'Malley, Jr., U. S. Atty., Scranton, Pa., Harry A. Nagle (Argued), Asst. U. S. Atty., Lewisburg, Pa., for appellee United States of America.

Before WEIS and GARTH, Circuit Judges, and MILLER,* Judge.

## OPINION OF THE COURT

MILLER, Judge.

Appellant Van Scoy was convicted by a jury of aiding and abetting murder in the second degree at the United States Peniten-

---

* The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

tiary, Lewisburg, Pennsylvania, under 18 U.S.C. §§ 1111 and 2. On April 24, 1980, he was sentenced to custody of the Attorney General for a period of twenty-five years to commence upon expiration of a sentence he was then serving. From the district court's judgment, Van Scoy appeals. We affirm.

An original indictment by the grand jury was returned against Van Scoy and one Ronald Lee Kesting, both sentenced prisoners, on November 14, 1979. By leave of court, this was dismissed on November 29,[1] and a new indictment was returned on December 13, 1979, charging that they—

unlawfully, willfully, deliberately, maliciously, with premeditation and malice aforethought, did murder Jose Gonzalez by stabbing him with a knife and did aid and abet one another in the commission of the said murder.

On December 20, 1979, in the course of pretrial proceedings, the Government waived the death penalty with respect to both defendants in order to eliminate any question over the Supreme Court's holding in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). At trial, which began on March 18, 1980, and continued (except for March 22 and 23) through March 28, Kesting testified for the defense and admitted his intentional killing of Gonzalez, who also was an inmate at the Lewisburg penitentiary.

Van Scoy has raised nine issues for review which will be considered seriatim.

Whether the district court erred in denying Van Scoy's motion to suppress certain written statements.

The incident involving Gonzalez occurred on August 11, 1978. On September 4, Van Scoy and Kesting were charged with violating prison regulations in that incident and were segregated from the general prison

---

1. The Government's reason for dismissal was that the original indictment did not "specifically charge either Defendant with aiding and abetting in the murder of Jose Gonzalez."

population.[2] Van Scoy was placed in a cell immediately below one Ronald Casebeer, an inmate who had been segregated earlier on administrative charges of attempting to escape and conspiracy to firebomb the front gate of the penitentiary. Van Scoy and Casebeer knew each other. They engaged in conversation and secretly exchanged handwritten letters, using a fishing line, which Casebeer dropped to Van Scoy's cell. Three letters from Van Scoy to Casebeer inculpated Van Scoy in the Gonzalez murder. These were received by Casebeer between September 5 and September 10, 1978. Van Scoy argues that Casebeer was a known Government informant "operating as such but without instructions to obtain any specific information," that the letters were obtained in violation of his Sixth Amendment rights, and that they were inadmissible at trial under the rationale of *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).[3] In the alternative, he argues that the findings of the district court were clearly erroneous.

Prior to trial, Van Scoy filed a motion to suppress the letters, and the Government filed a response thereto. A hearing was held on February 12, 14, 19, 22, and 25, 1980, comprising thirteen hours of testimony. At the conclusion of the hearing, counsel filed briefs. On March 10, 1980, the district court issued an order denying the motion to suppress. Pertinent portions of the order are set forth below:

> The hearing disclosed that on April 14, 1978, Ronald Casebeer arrived at Lewisburg on a bus from the Atlanta Penitentiary.... On May 23, 1978, Casebeer ... was placed in the special housing unit of the Lewisburg Penitentiary. Casebeer remained in the special housing unit until October 31, 1978 when he was transferred to the Atlanta Penitentiary on a writ of habeas corpus ad testificandum....

Sometime near the beginning of June, 1978, Casebeer gave a note to Lieutenant Jerry Brookmole, Special Intelligence Supervisor at the Penitentiary, which requested a meeting with a member of the F.B.I. Apparently, the FBI office in Atlanta independently directed special agent Richard Rodgers to seek out Casebeer in connection with the investigation of two murders at the Atlanta Penitentiary. In the summer of 1978, Casebeer met with special agent Rodgers as well as agent Carlyle R. Thompson. At the meeting with the FBI agents, Casebeer gave them some information with regard to the Atlanta murders which in the view of the agents did not require Casebeer to be given any special protection. In October of 1978, Casebeer again requested through Lt. Brookmole to see the F.B.I. agents. At a meeting held with the F.B.I. agents on October 27, 1978, Casebeer indicated that he had information bearing on the murder of Jose Gonzalez on August 11, 1978.

Casebeer requested that certain documents be brought from his personal property which had been stored in an inmate property room while he was in the special housing unit, a manila envelope containing three letters allegedly written by Defendant Van Scoy to Casebeer while both inmates were housed in the special housing unit of the Lewisburg Penitentiary.

The letters detailed a number of facts about the murder of Gonzalez. Casebeer testified that the letters were solicited from Van Scoy by Casebeer when Casebeer was located in a cell *immediately*

---

2. There is no evidence that the delay between their segregation and indictment was the result of the Government's purpose to obtain tactical advantage to their prejudice or that any prejudice in fact occurred. *United States v. Walker*, 601 F.2d 1051 (9th Cir. 1979).

3. Van Scoy also asserts that, "at the time Casebeer elicited the statements from Van Scoy, the latter was the focus of an investigation" and that this compels reversal here, citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

above Van Scoy's cell. Casebeer and inmate Richard McCue had decided to concoct a story essentially that they had witnessed two black inmates assault and kill Gonzalez. As a result of the story, Van Scoy was expected to be exonerated. The purpose of Casebeer's letters was to elicit sufficient information from Van Scoy so that Casebeer and McCue could create credible stories.

Casebeer secured the first two letters from Van Scoy as a result of written inquiries. The third letter from Van Scoy was unsolicited. . . .

. . . .

. . . Despite the Defendant's arguments, the Court is not at all persuaded that Casebeer was in fact a government agent. Although it is true that Casebeer had served as an informant with regard to the Atlanta murders, there is nothing to suggest that Casebeer had been paid by the F.B.I. to serve as an informant and in fact the FBI agents testified that he had not been given any favorable treatment because of his cooperation with the Government either as to the Atlanta murders or as to the Gonzalez information. Some testimony indicated that Casebeer at some time served as an informant in the civil case of *Picariello v. Fenton,* No. 29–317 (M.D.Pa.). It did not suggest that the Government instructed Casebeer to secure certain information with regard to the Gonzalez murder or that Casebeer was in any way paid to discover such information. At best, it can be said that Casebeer was willing to furnish certain information without any instructions from the Government. Although it is true that Casebeer undoubtedly knew that the information he secured would be useful and accepted by the Government, it is the Court's view that this does not convert him into a government agent. . . . and the Court cannot say that the mere acceptance of such inculpatory information converts an informant acting without direction from the Government into a government agent.

. . . Since the Court has determined that Casebeer was not a government agent, *Miranda's* protections are inapplicable. . . .

■ We are satisfied that the evidence of record amply supports the findings of the district court and that those findings are not clearly erroneous. The standard of appellate review of such findings was stated in *Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir. 1972) as follows:

"In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are 'left with a definite and firm conviction that a mistake has been committed.'" *Speyer, Inc. v. Humble Oil and Refining Co.,* 403 F.2d 766, 770 (3d Cir. 1968).

Although that was a civil case, and there is no counterpart in the Federal Rules of Criminal Procedure to Rule 52(a), Fed.R. Civ.P., which prescribes the "clearly erroneous" rule, it appears to be well settled that the rule applies in criminal cases. *United States v. Marley,* 549 F.2d 561 (8th Cir. 1977); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 922 (3d Cir. 1974); *United States v. Trice,* 476 F.2d 89 (9th Cir.), *cert. denied,* 414 U.S. 843, 94 S.Ct. 103, 38 L.Ed.2d 81 (1973); *United States v. Tallman,* 437 F.2d 1103 (7th Cir. 1971); *United States v. Lawrenson,* 298 F.2d 880 (4th Cir.), *cert. denied,* 370 U.S. 947, 82 S.Ct. 1594, 8 L.Ed.2d 812 (1962); *United States v. Abel,* 258 F.2d 485, 494 (2d Cir. 1958), *aff'd,* 362 U.S. 217, 226–28, 80 S.Ct. 683, 690–91, 4 L.Ed.2d 668 (1960).

■ Van Scoy's reliance on *United States v. Henry, supra,* is misplaced. In that case, the testimony of the Government's informant was held to have been erroneously admitted in derogation of Henry's Sixth Amendment rights because the informant

was a government agent acting under instructions and paid on a contingent fee basis for obtaining incriminating information from Henry.[4] In this case, the district court found that, at the time Van Scoy's letters were solicited and received by Casebeer, Casebeer was not a government agent, and on the record before us it cannot be said that the finding was clearly erroneous.[5] That Casebeer was not a government agent also sets this case apart from *Massiah, Miranda,* and *Escobedo,* all *supra,* cited by Van Scoy.

■ There was no error in the district court's denial of the motion to suppress.

Whether the trial judge's comment to the jury that the death penalty was not involved was prejudicial.

The trial judge conducted the voir dire during the jury selection and instructed the jury that the death penalty had been waived by the Government. Van Scoy's counsel, at side-bar, entered objection to the statement and later, prior to trial, moved for a mistrial. On February 28, 1980, the motion was denied, with the court adding that—"The jury will be charged not to consider the fact that the death penalty has been waived in this case in reaching its verdict unless the Defendant objects thereto."

■ Van Scoy quotes the following portion of the court's comments to counsel regarding the pending motion for mistrial:

Well, these are matters that are so intricate that Judges, lawyers, and law clerks have difficulty with them and I thought it proper to get people on this jury who wouldn't be perturbed by that possibility. So that's why I asked the

question. And we will go into it thoroughly and it's not as simple as I thought. But that is the reason why I made the statement that I did.

This should be put in perspective by quoting what immediately preceded it:

And the last point I wanted to bring up was, on the pending motion for mistrial because of my statement to the jury that there was no death penalty here. When I came down to the bench book pages relating to voir dire questions, there is one and I'll read it to you, on capital offenses, 1.11. It's Page 1.12.3, the issue on 4/30/71—that's April 30, '71—Paragraph 3(T) as in trouble. "Capital cases only. Do you have conscientious scrupples against capital punishment (in the event of an affirmative answer, the individual questioning should follow the guidelines set forth in *Witherspoon versus Illinois,* 391 U.S. [510] 520 [88 S.Ct. 1770, 1776, 20 L.Ed.2d 776] (1968)." Now, when I saw that, it seemed to me that if there were a capital punishment or death penalty possibility here, that we'd have to go through all that and that these jurors really didn't know whether there was possibility of capital punishment or not, and that this was a fact, the fact that the Government had waived the death penalty, was a fact that the jurors ought to know. If you had asked me to state with precision as to whether there could be a death penalty in this case. I really don't know the answer. I think that the Government probably could have indicted Mr. Van Scoy under a correlative Pennsylvania statute, assuming that Pennsylvania has brought its death penalty up to date, and could have sought the death penalty.

---

4. Similarly, in *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980), the informant Kaminsky, although not being compensated on a contingent fee basis, was a government agent whose freedom on probation was contingent on his "unstinted, unlimited full cooperation with all the authorities" as an informer.

5. Accordingly, it is unnecessary to decide the constitutional significance of Van Scoy's ad-

ministrative segregation, although we note the following cases which bear on that subject: *United States v. Mills,* 641 F.2d 785 (9th Cir. 1981); *United States v. Blevins,* 593 F.2d 646 (5th Cir. 1979); *United States v. Smith,* 464 F.2d 194 (10th Cir.), *cert. denied,* 409 U.S. 1066, 93 S.Ct. 566, 34 L.Ed.2d 519 (1972); *United States v. Reid,* 437 F.2d 1166 (7th Cir. 1971).

Van Scoy argues that—"Obviously choosing persons who would not be perturbed by the *lack* of a death penalty would be [*sic*] people more likely to convict." (Emphasis added.) However, this does not reflect the view of the trial judge, who said (in full context) that his objective was to get people on the jury who would not be perturbed by "that possibility," which obviously referred to the possibility of the death penalty. The Van Scoy argument is mere speculation; whereas, the trial judge's view is consistent with the law. Thus, where the death penalty is a possibility, the trial judge should examine the prospective jurors to ascertain whether any of them would clearly vote against imposition of the death penalty *regardless of the evidence* (*Boulden v. Holman*, 394 U.S. 478, 482, 89 S.Ct. 1138, 1140–41, 22 L.Ed.2d 433 (1969); *Witherspoon v. Illinois*, 391 U.S. 510, 520, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968));[6] and such jurors can be stricken for cause (*Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *United States v. Odom*, 348 F.Supp. 889, 894 (M.D.Pa.1972), aff'd, 475 F.2d 1397 (3d Cir.), *cert. denied*, 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973)). Although, as Van Scoy says, the question of punishment is not relevant to the issue of innocence or guilt, this does not lead to his conclusion that "it was therefore improper for the trial judge to give any instruction whatsoever." Rather, it compels a holding that the trial judge correctly removed an irrelevant factor (the possibility of the death penalty) from consideration of the issue of innocence or guilt.

Whether the trial court erred in refusing to dismiss the indictment because identifiable groups of individuals were specifically excluded from the grand jury panel.

■ Van Scoy made a timely motion (denied) to dismiss the indictment for the reason that the Juror Selection Plan of the Middle District of Pennsylvania excluded from jury service practicing physicians, dentists, lawyers, and women with children under ten years of age. Although recognizing that the Plan complies with the letter of the Federal Jury Selection and Service Act of 1968 (28 U.S.C. § 1861 et seq.),[7] Van Scoy argues that exclusion of these identifiable groups under the plan violated his Sixth Amendment right "to a venire which is fairly representative of a cross-section of the community."

It appears that in the district court Van Scoy did not raise the exclusion of women with children under ten years of age, so the point is untimely. Even so, it may be observed that the Supreme Court has upheld such an exclusion as a reasonable exercise of the state's power to assure "that members of the family responsible for the care of children are available to do so." *Duren v. Missouri*, 439 U.S. 357, 370, 99 S.Ct. 664, 671, 58 L.Ed.2d 579 (1979).

We observe that section 701 of the Middle District of Pennsylvania Plan provides that practicing physicians, dentists, and lawyers, among others, shall be *excused* from jury service *upon a request* and that this provision rests on the district court's finding that such service "would entail undue hardship or extreme inconvenience." Thus, the Plan

---

**6.** As shown by the trial judge's comments, *supra*, he was fully cognizant of the law on this point. Since the Government had waived the death penalty, by advising the prospective jurors of this fact, the trial judge merely avoided having to question each of them regarding his or her prejudice where the death penalty would be a possibility.

**7.** 28 U.S.C. § 1863(b)(5) provides that each United States district court plan shall—

specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the

plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof, and excuse of members thereof would not be inconsistent with sections 1861 and 1862 of this title.

Section 1861 states the policy of the United States to be that all litigants in federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community. Section 1862 provides that no citizen shall be excluded from jury service on account of race, color, religion, sex, national origin, or economic status.

clearly conforms to the requirements to 28 U.S.C. § 1863(b)(5). Similar exclusions in other plans have been upheld. *United States v. Goodlow*, 597 F.2d 159 (9th Cir. 1979); *United States v. Horton*, 526 F.2d 884 (5th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976).

With respect to the requirement of 28 U.S.C. § 1861 that a jury shall be selected "from a fair cross section of the community," Van Scoy cites *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), for the proposition that no significant segment of the general population may be systematically excluded, while recognizing that the 53% of eligible citizens excluded there (all women) was "mathematically many times as large as the group excluded here." However, as pointed out above, the Middle District of Pennsylvania Plan does not systematically "exclude" but, rather, excuses upon request members of the indicated groups. Moreover, Van Scoy has failed to show that the grand jury which indicted him was not composed of "a fair cross section of the community." As found by the district court, Van Scoy—

> offered no evidence of the percentage of the community comprised by this group [doctors, dentists, and attorneys] other than the affidavit of his attorney which sets forth the attorney's belief that this group constitutes 4% of the population. Assuming that this affidavit is sufficient, there has been no showing of the representation of this group on venires from which grand juries are selected.

We note that the affidavit referred to states:

> The Defendant has made no statistical survey of the population density of the excluded group, but believes, based on an informal analysis of the Williamsport area, that practicing physicians, dentists, and attorneys would constitute approximately 4% of the total population.

There is no evidence of the informal analysis itself or whether any account was taken of the demographic difference between the Williamsport area and the remainder of Lycoming County and the other eleven counties comprising the Middle District.

We are not persuaded that the trial court erred in refusing to dismiss the indictment.

Whether the district court erred in admitting evidence of statements of coconspirators since a conspiracy was never charged and a "contract killing" forming the basis of the alleged conspiracy was not revealed in the Government's Bill of Particulars.

■ We are not persuaded of any error on the part of the district court with respect to this issue. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that statements of coconspirators during the course of and in furtherance of a conspiracy are admissible. Moreover, this court has held that, when a conspiracy in fact has been proved, absence of a conspiracy count in the indictment is without legal significance in determining admissibility of such statements. *United States v. Trowery*, 542 F.2d 623 (3d Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977). Even if a jury acquits on a conspiracy charge, it may convict on aiding and abetting. *United States v. McCrane*, 527 F.2d 906, 912 (3d Cir. 1975), *vacated on other grounds*, 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (1976).

The Government's answer to the bill of particulars states, *inter alia*, that—

> 3. Ronald Lee Kesting is the person who stabbed Jose Gonzalez with the assistance of Phillip Dale Van Scoy.
>
> 6. Specific acts of Defendant Van Scoy in the commission of the murder of Jose Gonzalez are as follows:
>
> a. Defendant Van Scoy received information about an agreement to remove Jose Gonzalez by threat and/or force from the general population of the United States Penitentiary, Lewisburg, Pennsylvania.
>
> b. Defendant Van Scoy acted as a shield and lookout for Defendant Ronald Kesting when he obtained and hid a knife.
>
> c. Defendant Van Scoy participated in the sharing of proceeds of an agreement to remove Jose Gonzalez from the

general population of the United States Penitentiary at Lewisburg, Pennsylvania.

d. Defendant Van Scoy obtained a pipe and gave it to Defendant Kesting to be used in the execution of the plan to remove Jose Gonzalez from the general population of the United States Penitentiary at Lewisburg, Pennsylvania.

e. Defendant Van Scoy acted as a lookout in attempted assaults by pipe.

f. Defendant Van Scoy acted as a lookout in the fatal stabbing of Jose Gonzalez.

From these statements it is clear that, while the phrase "contract killing" was not used, Van Scoy was fully informed of the Government's theory of the case, namely: that there was a plan to remove Gonzalez from the general population and that Van Scoy aided and abetted Kesting in carrying it out and shared in the proceeds. Moreover, as the Government points out, a copy of one of Van Scoy's letters, which uses the word "contract," was given to Van Scoy's counsel more than two month's prior to trial and again at the pretrial suppression hearing.[8]

Whether the Government's threat of possible legal action against defense counsel for talking to a Government witness who spoke voluntarily to defense counsel was prejudicial and in violation of defendant's rights.

█ The gravaman implicitly alleged in this issue is that Van Scoy was deprived of his constitutional right to effective assistance of counsel because of statements by the Assistant U. S. Attorney "designed to chill Mr. Van Scoy's right to confront his witnesses."

According to Mr. Rieders, one of the two court-appointed defense counsel, he spoke with one Curtis Montrey on March 12, 1980, at the Marshall's lock-up at the Federal Building in Williamsport; he "had been trying to speak with Mr. Montrey for some time but the Government would not indicate where Mr. Montrey was located and would not cooperate in any other manner"; during the conversation, Montrey made statements implicating himself in the murder of Gonzalez, whereupon the interview was terminated; later that day, the Assistant U. S. Attorney who prosecuted the case telephoned him and stated that F.B.I. Agent Rodgers had spoken with Montrey following the interview and was told that defense counsel offered to send an attorney around to see Montrey; the Assistant U. S. Attorney "blatently threatened the undersigned [defense counsel] with criminal prosecution for some unnamed alleged violation of the United States Code and the prosecutor said he would not let defense counsel speak with any more Government witnesses"; and the statements by the Assistant U. S. Attorney and the report by Agent Rodgers were untrue.

In response, the Government states that Montrey testified at the suppression hearing on February 25, 1980; that defense counsel had an opportunity to interview him prior to his testimony at the suppression hearing; that the Government arranged for the interview with Montrey by defense counsel on March 12, 1980 (over two weeks prior to trial); that, following the interview, Montrey informed Agent Rodgers that he had told defense counsel of his desire to testify at the trial and did not need or desire counsel, but that defense counsel stated he was going to have counsel provided for him; that, in order to avoid a unilateral effort to impose counsel upon a

---

8. Van Scoy argues that the trial court erred in refusing "to charge that any other criminal venture which would not involve the use of a knife to stab Gonzalez [such as serving as a lookout for Kesting as he hid and waited to assault Gonzalez with a pipe] should not be considered by the jury." However, any evidence that would show premeditation was entirely proper for the jury to consider, because

the indictment included the charge of murder in the first degree. It can hardly be said that Van Scoy's conviction of aiding and abetting the lesser included offense of murder in the second degree should be reversed because, although there was evidence of premeditation, the jury did not find him guilty on the greater charge. See United States v. Krogstad, 576 F.2d 22 (3d Cir. 1978).

witness, Government counsel called defense counsel and informed him of Rodgers' report and cautioned him on the provisions of 18 U.S.C. § 1503 relating to intimidation of witnesses; that defense counsel demanded to know whether he was being prosecuted and was told that he was not, that Government counsel would make no decision on the matter, and that a copy of Agent Rodgers' report was being sent to the U. S. Attorney; and that the action of Government counsel was not for the purpose of threatening defense counsel, but to prevent what appeared to be an imminent danger that defense counsel would unilaterally seek to impose counsel upon Montrey against his stated intention to not be represented by counsel.

Pointing out that the burden of proof of ineffective counsel is upon Van Scoy, *United States v. Williams,* 615 F.2d 585, 594 (3d Cir. 1980); *United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 174 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), the Government argues that there is "not one iota of evidence that defense counsel was intimidated by anything Government counsel did" and asserts that defense counsel "presented a vigorous defense by means of a multitude of pretrial and trial motions, in depth cross-examination of Government witnesses and he presented testimony of numerous defense witnesses, including the testimony of the actual murderer, Ronald Kesting."

Considering the arguments of counsel in light of the record, we are persuaded that Van Scoy was not deprived of his right to effective assistance of counsel or otherwise prejudiced by the statements of Government counsel.

Whether a mistrial should have been declared because of a reference by a Government witness insinuating that his life was in danger for testifying and that the danger emanated from defendant or defendant's associates.

Van Scoy points to the following testimony on redirect examination of Montrey:

Q. Mr. Montrey, it was · discussed on cross-examination the medication that you are taking. Is this medication you are taking on your own or is this prescribed medication?

A. It is prescribed.

Q. Do you know why it is being prescribed for you?

A. Because I have a nervous condition.

Q. Way are you nervous?

A. Because of what is happening right now, the killing I saw, the contracts that are out on me and the people that I know want to kill me.

Van Scoy argues that, although his name was not mentioned by Montrey, "it must have been undoubted by the jury that Montrey would only be afraid about testifying in this case if those who had a 'contract' on him were somehow involved with Van Scoy." Of course, this is pure speculation. However, the complete answer is that the above quoted testimony was within the scope of the cross-examination of Montrey by Van Scoy's counsel. On two occasions during that cross-examination, Montrey referred to his life being in danger because of his testimony, and defense counsel made no request of the court for a corrective instruction; also, defense counsel questioned Montrey concerning his feeling paranoid and jittery, the types and quantities of medication (valium, meprobamate, and chlorohydrate) he was taking, their effect upon him, and his prior illegal drug use.

The Government argues that defense counsel was seeking to establish that Montrey was psychotic and that the redirect examination was necessary to show that the medication was prescribed to treat his nervousness brought on by his seeing the Gonzalez murder and his fear for his own life.

We are persuaded that the district court did not err in failing to declare a mistrial.[9]

Whether a psychiatrist or an attorney or both should have been appointed for a Government witness who manifested severe emotional problems, possible drug

---

9. Even if there was error in this phase of the trial, it was defense-initiated error and, therefore, not a cause for reversal. *United States v. Steele,* 610 F.2d 504 (8th Cir. 1979).

dependency, and was asked to testify to self-incriminating facts.

Van Scoy argues that it was reversible error for the district court to fail to appoint a psychiatrist to examine Montrey. However, at trial Montrey stated that he would not see a psychiatrist if the court were to appoint one; and he testified that he had received the services of a medical doctor, who prescribed the medication he was taking.

With respect to appointment of an attorney, Montrey was advised of his right to counsel and his privilege against self-incrimination on three different occasions: at an interview with FBI agents some four weeks after the Gonzalez murder; at an appearance before the grand jury; and at trial, prior to testifying before the jury. Each time he waived these rights. These rights were personal to Montrey, and Van Scoy cannot claim error in his own behalf on account of their alleged violations. *United States v. Guanti*, 421 F.2d 792, 799 (2d Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); see *United States v. Sacco*, 436 F.2d 780 (2d Cir.), *cert. denied*, 404 U.S. 834, 92 S.Ct. 116, 30 L.Ed.2d 64 (1971); *Eberhart v. United States*, 262 F.2d 421 n.1 (9th Cir. 1958); *Lovette v. United States*, 230 F.2d 263 (5th Cir. 1956); *Wilson v. United States*, 218 F.2d 754 (10th Cir. 1955); *United States v. Wainer*, 49 F.2d 789, 794 (3 Cir. 1931).

Van Scoy asserts that "[t]he evidence indicates that Montrey was kept from Defense counsel, intimidated into not requesting an attorney by agent Rogers [*sic*] and received all the drugs which he wanted." However, the record does not support the assertion.

There was no error or abuse of discretion by the trial judge.

Whether defendant's points for charge concerning aiding and abetting were improperly denied.

Van Scoy, in his point for charge No. 3, requested the trial judge to instruct the jury on the definition of aiding and abetting and the need for finding that he provided assistance in the actual murder. This charge was not given; nor was an oral request granted to instruct the jury that the assistance provided by Van Scoy must relate to the actual murder. He points out that the trial judge instructed the jury that they could convict on their belief that Van Scoy wilfully "associated himself in some way with the criminal venture," sought "to make the criminal venture succeed," knew that "the venture" was occurring, and "associated himself with the effort to murder Jose Gonzalez." Van Scoy argues that this charge left the jury open to find that he was "associated" with the plan to remove Gonzalez from the general population and to use that finding as a basis for convicting him on the aiding and abetting charge even though his acts were found to not relate to the actual murder. He stresses that such a finding would be on the general theory that a conspirator is responsible for the acts of his coconspirators; whereas, the offense of aiding and abetting requires a defendant's own acts as the basis for the crime.

█ We are satisfied that the trial judge's charge, considered as a whole, precluded the jury from finding him guilty of aiding and abetting on the basis hypothesized by Van Scoy. Thus, the trial judge made it clear that there could not be a conviction for aiding and abetting unless the murder charged in the indictment took place. He listed the elements of the charge of aiding and abetting as follows:

> First, that Mr. Van Scoy knew that the venture was occurring. Two, that Mr. Van Scoy associated himself with the effort to murder Jose Gonzalez. Three, that Phillip Van Scoy participated in the murder of Jose Gonzalez as something he wished to bring about. Four, that he committed some overt act to make the murder of Jose Gonzalez a success.

In addition, the trial judge instructed the jury that "Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that the defendant aided and abetted the crime unless you find beyond a reasonably doubt that he was a participant and . . . not

merely a knowing spectator." These and the other instructions, which appear in the Appendix of Appellant, correctly stated the law. *See United States v. Barber*, 429 F.2d 1394 (3d Cir. 1970).

Whether the U. S. Attorney committed reversible error in his closing remarks to the jury because of inflammatory remarks concerning the defendant and defense counsel.

Van Scoy argues that in closing remarks the U. S. Attorney improperly made reference to the fact that he took the stand and testified, and to his failure to explain key portions of his letters to Casebeer, particularly where the killing of Gonzalez was referred to as a "contract," to which defense counsel made timely objection and was overruled.[10] In response, the Government correctly points out that Van Scoy testified at the trial, thereby waiving his constitutional protection from self-incrimination, and that the prosecution had the right to comment on the credibility of all witnesses, including Van Scoy. *United States v. Salazar*, 485 F.2d 1272, 1280 (2d Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *Dyson v. United States*, 283 F.2d 636 (9th Cir. 1960), *cert. denied*, 366 U.S. 974, 81 S.Ct. 1944, 6 L.Ed.2d 1264 (1961).

Van Scoy complains that the Assistant U. S. Attorney argued that the presence of a pipe in the case could prove malice aforethought on his part, that the pipe "set out the purpose of viciously assaulting the decedent with what the jury may determine is in itself, G4, Government Exhibit 4, is in itself a deadly weapon," and "that a knife was used does not take away from the deadly effect of G4." Timely objection to this was overruled, and properly so. On cross-examination of Kesting by the Government, he had testified that he need-

ed Van Scoy and Montrey "as watchmen" and "I was going to hit the guy [Gonzalez] with the pipe"; further, that Van Scoy's function "was just to warn me if anyone else came around at the same time that Gonzalez walked down the hallway." The pipe was in evidence and that it possessed the characteristics of a deadly weapon is evident. Therefore, the prosecutor's comments were entirely proper. *United States Ex Rel. Coleman v. Mancusi*, 423 F.2d 985 (2d Cir.), *cert. denied*, 400 U.S. 842, 91 S.Ct. 84, 27 L.Ed.2d 77 (1970).

Finally, Van Scoy argues that "In their entirety, the prosecutor's remarks certainly evince a personal expression of belief of Defendant's guilt," citing *United States v. Bess*, 593 F.2d 749 (6th Cir. 1979). However, he does not specify any statements such as those that served as a basis for reversal in *Bess*: suggesting that the defendant was guilty merely because he was prosecuted by the Government; stating that he (the prosecutor) believed beyond a reasonable doubt, based on evidence which had been presented to the jury, that the defendant committed the offense charged. *Cf. United States v. Swinehart*, 617 F.2d 336 (3d Cir. 1980). Rather, he refers generally to "prosecutorial statements" concerning evidence adduced at trial and adds that "there was also an inference at least with respect to the deadly weapon and 'contracts' on Montrey's life that the prosecutor knew about something incriminating outside the courtroom." We have already disposed of the argument on statements by the prosecutor concerning the evidence, and the tenous suggestion that there was an inference that the prosecutor knew about something incriminating outside the courtroom is without merit.

In view of all the foregoing, the judgment of the district court will be affirmed.

---

10. The prosecutor said, apropos his comment about Van Scoy's failure to explain the "contract," that "every time I came to it Mr. Reiders jumped up and objected." The trial judge said: "but I don't think it is fair comment to remark about counsel objecting. He clearly has the right and as a matter of fact the duty to do that if he feels that the question is improper. So I don't think that it is fair comment." On this

point, Van Scoy declares: "The United States Attorney unabashedly criticized Defense counsel to the jury for performing a basic function." Such an isolated comment by the prosecutor, particularly when objected to and properly criticized by the trial judge, is of de minimis proportions and can hardly serve as a basis for reversal.