

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-25-1994

# USA v. Brink

Precedential or Non-Precedential:

Docket 93-3397

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation
"USA v. Brink" (1994). *1994 Decisions.* Paper 168.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/168

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-3397
_____


UNITED STATES OF AMERICA

v.

WILLIAM HARRY BRINK,
                    Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 93-00035)
_____


Argued April 13, 1994

Before:  BECKER, MANSMANN and SCIRICA, <u>Circuit</u> <u>Judges</u>

(Filed Otober 27, 1994)


        ALEXANDER H. LINDSAY, JR., ESQUIRE (Argued)
        Lindsay, Lutz, Jackson, Pawk & McKay
        408 North Main Street
        Butler, Pennsylvania 16001

        Attorney for Appellant


        PAUL J. BRYSH, ESQUIRE (Argued)
        Office of United States Attorney
        633 United States Post Office & Courthouse
        Pittsburgh, Pennsylvania 15219

        Attorney for Appellee

———————————————

OPINION OF THE COURT

———————————————

SCIRICA, Circuit Judge.


William Harry Brink appeals his conviction for bank robbery. Brink contends the government violated his Sixth Amendment right to counsel by placing him in a cell with a known informant in a deliberate attempt to elicit self-incriminating statements. He also contends the district court erred by allowing him to introduce an eyewitness' prior identification only for impeachment purposes, rather than as substantive evidence. Although Brink has made a colorable Sixth Amendment claim, the record before us is inadequate to resolve it because the district court denied Brink's request for an evidentiary hearing. Therefore, we will vacate the judgment of conviction and sentence and remand for an evidentiary hearing to decide that issue.

## I. Facts and Procedure

On December 16, 1992, a masked gunman robbed the Farmers National Bank in East Brady, Pennsylvania and stole $4,434.00 in cash. Brink was arrested for the crime and charged with bank robbery, 18 U.S.C. § 2113(a) (1988); armed bank robbery, id. § 2113(d); and use of a firearm in a crime of violence, id. § 924(c).

Before trial, Brink was confined to Clarion County prison where he shared a cell with Ronald Scott. After learning

Scott was scheduled to testify at his trial, Brink discovered Scott had been an informant for the Pennsylvania State Police and the Federal Bureau of Investigations on five previous occasions. Brink requested a pre-trial evidentiary hearing to determine Scott's involvement with the State Police and the FBI. The court denied Brink's motion. At trial, Scott testified that, while in Clarion County prison, Brink confessed to committing the bank robbery and admitted to manufacturing an alibi.

The principal eyewitnesses at trial were Annette Miller and Marilyn Ann Simpson, two bank tellers on duty at the time of the robbery, who identified Brink as the robber after testifying that they knew him both as a customer and from prior associations. They based their identifications on the visible parts of his face, his mannerisms and his voice. Miller stated that although she got a good look at his eyes, she could not remember what color they were. An FBI agent, however, testified that the day after the robbery, Miller told him the robber had dark eyes.[1]

The prosecution also introduced photographs taken by bank surveillance cameras,[2] testimony that Brink had been seen with stacks of money the night after the robbery, and evidence

---

[1]. Brink has light hazel eyes.

[2]. The pictures taken were inconclusive as to the robber's identity.

that $220 was found in the sofa of a house where Brink had been doing construction work during the week of the robbery.[3]

In defense, Brink offered the testimony of John Olcus, his neighbor, and Natalie Reefer, a mail carrier. Olcus testified that he saw Brink at his house at or near the time of the robbery.[4] Reefer, who did not know Brink but was standing with Olcus when a car drove up to Brink's home around the time of the robbery, testified that she saw a red Subaru drive up to Brink's house and that Olcus told her Brink was the driver.

A jury found Brink guilty on all three counts. Brink filed a motion for a new trial, which the court denied. This timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291 (1988).

## II. Right to Counsel

Over objection, Brink's pre-trial cellmate, Ronald Scott, testified that, while in Clarion County prison, Brink told him that he robbed the Farmers National Bank and how he devised an alibi. Brink contends the government violated his Sixth Amendment right to counsel by placing him in a cell with Scott

---

[3]. Two FBI expert witnesses also testified. A photography expert testified to five similar features between the denim jacket worn by the robber in the surveillance photographs and a jacket obtained from Brink's home. A firearms expert testified that the gun in the photographs was a revolver, as was the gun obtained from Brink's home. Both experts stated they could not positively identify the objects in the photographs as the objects in evidence.

[4]. Brink's house is approximately 4½ miles from Farmers National Bank. Olcus testified it would take at least 10 minutes to drive from the bank to Brink's house.

because, he claims, Scott was a government agent deliberately attempting to elicit incriminating evidence outside the presence of Brink's counsel.  We apply plenary review to the district court's application of legal precepts, see Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1370 (3d Cir.), cert. denied, 498 U.S. 899 (1990), and clearly erroneous review to its factual findings, see United States v. Kim, 27 F.3d 947, 958 (3d Cir. 1994); Monachelli v. Warden, SCI Graterford, 884 F.2d 749, 750 (3d Cir. 1989).

The deliberate use of jailhouse informants to elicit incriminating information may violate a defendant's right to counsel. United States v. Henry, 447 U.S. 264, 274 (1980); see also Massiah v. United States, 377 U.S. 201, 206 (1964).  In Massiah v. United States, the Supreme Court held the government violates a prisoner's Sixth Amendment right to counsel when it uses, as evidence, statements made by the defendant "which [it] had deliberately elicited from him after he had been indicted and in the absence of his counsel."  Id. at 206.  Massiah, a merchant seamen, had been charged with various narcotics offenses.  Id. at 202.  After release on bail, Massiah met with Colson, a co-defendant, in Colson's parked car where, unbeknownst to Massiah, Colson had allowed government agents to install a radio transmitter under the front seat.  Id. at 202-03.  During the course of their meeting, an FBI agent overheard Massiah make incriminating statements, which the agent later recounted at trial.  On appeal, Massiah maintained that use of the radio transmitter was an illegal search under the Fourth Amendment and

that admission of the agent's testimony violated his rights under the Fifth and Sixth Amendments by forcing him to incriminate himself and by interrogating him outside the presence of his attorney. Id. at 203-04. Without reaching his other arguments, the Court agreed with Massiah on the Sixth Amendment claim. Noting that the Constitution guarantees the right to counsel as much during the period between arraignment and trial as during the trial itself, the Court stated, "`if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. [M]assiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent.'" Id. at 206 (quoting United States v. Massiah, 307 F.2d 62, 72-73 (2d Cir. 1962) (Hays, J., dissenting)).

In United States v. Henry, the Court reaffirmed the principles of Massiah on facts similar to this case. Like here, the defendant in a bank robbery prosecution challenged the admission of his pre-trial cellmate's testimony on the grounds that the cellmate was a government agent. 447 U.S. at 265. Even though the informant was given specific instructions not to question Henry about his case, the Court found the government had in fact "deliberately elicited" the information from Henry, stating, "[e]ven if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." Id. at 271. Consequently, the Court found that the government violated

Henry's right to counsel by "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel."  Id. at 274; see also Maine v. Moulton, 474 U.S. 159 (1985) (right to counsel violated where codefendant, as government agent, meets with defendant and discusses crime, even though defendant, not government, requested meeting).

Massiah and Henry establish that the government violates a pre-trial detainee's right to counsel when it deliberately creates a situation in which a prisoner is likely to make incriminating statements, Henry, 447 U.S. at 274, and deliberately uses an informant to elicit information from the prisoner, Massiah, 447 U.S. at 269.  But the Court stopped short of excluding all incriminating statements reported by jailhouse informants, and "left open the question whether the Sixth Amendment forbids admission in evidence of an accused's statements to a jailhouse informant who was `placed in close proximity but [made] no effort to stimulate conversations about the crime charged.'" Kuhlmann v. Wilson, 477 U.S. 436, 456 (1986) (quoting Henry, 447 U.S. at 271 n.9)(alteration in Kuhlmann).

In Kuhlmann v. Wilson, the Court held that where a prisoner makes incriminating statements to a passive listener -- a "listening post" -- the introduction of the prisoner's statements does not violate his right to counsel because the informant's presence does not constitute an interrogation. 477 U.S. at 459 (primary concern of Massiah line of decisions is secret interrogation with techniques equivalent to direct police

interrogation).  In that case, the defendant and two accomplices robbed a taxicab garage and murdered the night dispatcher.  Id. at 438–39.  After arraignment, Kuhlmann was held in detention and placed in a cell with Lee, a police informant, who had agreed to aid the police in getting information about Kuhlmann's accomplices.  Id. at 439.  Lee had been expressly instructed not to ask Kuhlmann any questions about his case, but instead to "keep his ears open."  Id.  Although Kuhlmann never divulged the names of his accomplices, he admitted to committing the crime to Lee who reported it to the police.  The state trial court expressly found that Lee did not elicit statements from Kuhlmann and that Kuhlmann's statements were "spontaneous" and "unsolicited."  Id. at 440.  Kuhlmann was then convicted by a jury.  After unsuccessful appeals in the state court system and unsuccessful petitions for federal habeas corpus, the Supreme Court handed down its opinion in Henry whereupon Kuhlmann renewed his petition for federal habeas corpus.  After a divided panel of the United States Court of Appeals for the Second Circuit granted Kuhlmann's petition, id. at 441–43, the Supreme Court reversed.  Noting the presumption of correctness that must be afforded the trial court's factual finding, id. at 460, the Court held that introduction of Kuhlmann's self-incriminating statements did not violate his right to counsel because his spontaneous statements were not the result of an interrogation, id. at 459.

Henry and Kuhlmann set the bounds for using a prisoner's self-incriminating statements made to jailhouse informants.  The government violates a prisoner's right to

counsel when it places that prisoner in a cell with a jailhouse informant who "deliberately use[s] his position to secure incriminating information from [the defendant] when counsel was not present." Henry, 447 U.S. at 270. But it does not violate a prisoner's rights where "by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached." Kuhlmann, 477 U.S. at 459.

In finding the government deliberately elicited statements from the defendant in Henry, the Court found three factors to be significant: (1) the informant acted under instructions as a paid informant for the government;[5] (2) the informant appeared to be just another inmate; and (3) the defendant was in custody at the time the informant engaged him in conversations. 447 U.S. at 270. Because Scott presented himself as just another inmate and Brink was in custody the second and third factors are evident here. The only questions are whether Scott was acting as a government agent when he got Brink to tell him about the crime and whether that information was elicited deliberately.

In this case, even though Scott maintains he was not instructed to question Brink about the robbery, there is some

---

[5]. Although the Supreme Court emphasized the fact that the informant was "paid", 447 U.S. at 270 & n.7, we do not understand the Court to imply that only informants who receive cash are "paid informants." Instead, we believe the Court meant that any informant who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant.

evidence that Scott deliberately elicited information from Brink.[6]  On this record, however, it is unclear whether Scott was acting as a government agent while sharing Brink's cell.  An inmate who voluntarily furnishes information without instruction from the government is not a government agent, even if the informant had been an agent in the past.  See United States v. Van Scoy, 654 F.2d 257, 260 (3d Cir.), cert. denied, 454 U.S. 1126 (1981).  Because Scott admitted acting as a government agent in other cases,[7] but denied receiving any promises or rewards for informing on Brink, he may fall within this category.

But the record also contains evidence suggesting that Scott may have had a tacit agreement with the government.  Scott testified that he began informing in the hopes of having his sentence reduced.  The government trained him as an informant and at one point a government agent told Scott that his cooperation would be reported to the United States Attorney and the Attorney General.[8]  Therefore, Scott may have informed on Brink on the

[6].  The district court did not make a finding on whether Scott elicited information from Brink, but there is a colorable claim that Scott may have been more than just a listening post.  On cross-examination, at trial, Scott admitted that when acting as a government agent his method of obtaining information was to lie to his cellmates to gain their trust.  Scott admitted lying to Brink, and acknowledged he had gained Brink's trust.  Scott also discussed Brink's case with him, telling Brink he thought Brink was guilty, and even discussed the possibility of Brink escaping during a break in the trial.

[7].  Scott admitted to volunteering to be a government informant in 1990 or 1991.  Since then he has informed on at least six inmates in three jails or prisons.

[8].  This case is unlike Van Scoy, where the informant did not receive any favorable treatment from the FBI, 654 F.2d at 260,

reasonable assumption that government officials were aware of his actions and would reward him in the future, if not presently, with a recommendation for a reduction in his sentence.

It is also significant that after Scott began informing, the government placed him in a cell with a pretrial detainee. Scott testified that a state trooper approached him while he was sharing a cell with Brink to ask if Brink had given Scott any information about the crime. Since the government was aware of Scott's propensity to inform on his cellmates, we believe that placing him in a cell with a pretrial detainee could represent a deliberate effort to obtain incriminating information from a prisoner in violation of his Sixth Amendment right to counsel. Cf. Henry, 447 U.S. at 271 (government presumed to have known that placing informant in a cell with pretrial detainee would lead to informant taking affirmative steps to get incriminating statements).

We believe Brink has raised a colorable claim that the government violated his constitutional right to counsel by placing him in a cell with a known informant who may have been acting as a government agent. In these instances, the trial court should conduct an evidentiary hearing and make the necessary findings since such conduct, if proven, could violate a defendant's rights under the Sixth Amendment.[9] Because the
(..continued)
since the government honored Scott's request to be placed in the witness protection program after he testified against a cellmate in an earlier trial.

[9]. "Most constitutional errors have been held amenable to harmless-error analysis." Sullivan v. Louisiana, 113 S. Ct. 2078,

district court declined to hold an evidentiary hearing, we will vacate the judgment of conviction and sentence and remand for a hearing to determine whether Brink's rights under the Sixth Amendment were violated. Should the district court make this determination, Brink will be entitled to a new trial.

## III. Prior Identification

At trial, bank teller Annette Miller testified she was unable to recall the bank robber's eye color. FBI Agent McEachern testified that the day after the robbery, Miller told him the bank robber had dark colored eyes. Brink, whose eyes are light hazel, sought to use Miller's prior statement as substantive evidence of his innocence, but the court refused and instead gave the following instruction:

> You will recall that certain witnesses who testified during the trial had made statements before this trial about matters at issue in this case. These earlier statements

(..continued)
2081 (1993). Because the erroneous admission of a coerced confession does not automatically warrant a new trial, see Milton v. Wainwright, 407 U.S. 371, 377-78 (1972); see also Arizona v. Fulminante, 499 U.S. 279, 311 (1991) (Opinion of Rehnquist, C.J., for the Court), the district court judgment would stand if admitting Brink's confession was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 24 (1967); see also Fulminante, 499 U.S. at 295-96. We find, however, that the admission of Brink's confession, if error, was not harmless. When reviewing constitutional violations for harmless error our inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan, 113 S. Ct. at 2081. On this record we hold the guilty verdict was not surely unattributable to the introduction of Brink's confession, and therefore was not harmless. Cf. Fulminante, 499 U.S. at 296-302 (admission of coerced confession was not harmless despite admission of a second, lawfully-obtained confession and other circumstantial evidence).

were brought to your attention to help you decide if you believe that witness' testimony. You cannot use these earlier statements as evidence in this case.

Brink contends the district court erred because Federal Rule of Evidence 801(d)(1)(C) allows statements of prior identification to be admitted as substantive evidence.

**a.**

At the outset we must determine the proper scope of review. The government contends our review should be for plain error. Generally, we review evidentiary rulings for abuse of discretion, see, e.g., In re Merritt Logan, Inc., 901 F.2d 349, 359 (3d Cir. 1990), but when no objection is made at trial we review for plain error only. See Government of Virgin Islands v. Smith, 949 F.2d 677, 681 (3d Cir. 1991); United States v. Castro, 776 F.2d 1118, 1128 (3d Cir. 1985), cert. denied, 475 U.S. 1029 (1986).[10] This rule gives the court an opportunity to correct any mistakes before charging the jury, Santos, 932 F.2d at 251; United States v. Chicarelli, 445 F.2d 1111, 1115 (3d Cir. 1971)(quoting United States v. Provenzano, 334 F.2d 678, 690 (3d

---

[10]. The plain error doctrine "is intended to correct errors that are `obvious' or that otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.'" Government of Virgin Islands v. Charleswell, 24 F.3d 571, 576 (3d Cir. 1994) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). The doctrine provides for correction of a mistake "so `plain' the trial judge [was] derelict in countenancing it, even absent the defendant's timely" objection. United States v. Frady, 456 U.S. 152, 163 (1982); see also Government of Virgin Islands v. Knight, 989 F.2d 619, 631–32 (3d Cir.), cert. denied, 114 S. Ct. 556 (1993); United States v. Santos, 932 F.2d 244, 251 (3d Cir.), cert. denied, 112 S. Ct. 592 (1991).

Cir.), cert. denied, 379 U.S. 947 (1964)), and prevents the appellant from purposely failing to object in the hopes of later asserting the court's error as the basis for a new trial, Chicarelli, 445 F.2d at 1116 (quoting United States v. Grosso, 358 F.2d 154, 158 (3d Cir. 1966), rev'd on other grounds, 390 U.S. 62 (1968)).

Brink challenged the instruction, stating, "With regard to identification, we believe that under the federal rules it is not hearsay." The government maintains Brink's statement was not specific enough to constitute an objection. We disagree. Although Brink did not mention Rule 801(d)(1)(C) expressly, his objection was sufficiently specific to inform the district court. Cf. Santos, 932 F.2d at 250-51 (finding appellant's statement "I object to the refusal to charge points 1 through 6 of defendant's proposed points of charge" too general to alert district court to the specific objection raised on appeal); see also United States v. Castro, 776 F.2d 1118, 1129 (3d Cir. 1985). Because Brink's challenge put the district court on notice of the issue now raised on appeal, we review the district court ruling for abuse of discretion.

**b.**

The Federal Rules of Evidence provide "A statement is not hearsay if . . . one of identification of a person made after perceiving the person." Fed. R. Evid. 801(d)(1)(C) (West 1994). Statements of prior identification are admitted as substantive evidence because of "the generally unsatisfactory and inconclusive nature of courtroom identifications as compared with

those made at an earlier time under less suggestive conditions."
Fed. R. Evid. 801, Notes of Advisory Committee on 1972 Proposed
Rules; see S. Rep. No. 199, 94th Cong., 1st Sess. 2 (1975) ("Both
experience and psychological studies suggest that identifications
consisting of nonsuggestive lineups, photographic spreads, or
similar identifications, made reasonably soon after the offense,
are [more] reliable than in-court identifications.").  "Admitting
these prior identifications therefore provides greater fairness
to both the prosecution and the defense in a criminal trial."
Id.

Generally, evidence is admitted under Rule 801(d)(1)(C)
when a witness has identified the defendant in a lineup or
photospread, but forgets, or changes, his testimony at trial.
See, e.g., United States v. O'Malley, 796 F.2d 891, 898-99 (7th
Cir. 1986); United States v. Jarrad, 754 F.2d 1451, 1456 (9th
Cir.), cert. denied, 474 U.S. 830 (1985).  Although less common,
Miller's "exculpatory" prior identification falls within the
rule.  The rule's plain language does not exclude exculpatory
statements, nor can we find any reason to distrust the
reliability of this kind of identification.

Moreover, the fact that FBI agent McEachern, rather
than Miller, recited Miller's statement at trial does not
preclude introducing her statement as substantive evidence.
Debate on the 1975 amendment to the Rule demonstrates Congress
was aware that third parties would testify to the witness's prior
statements. See 121 Cong. Rec. 31,867 (1975) (statement of Rep.
Hungate) ("The bill . . . applies to situations where an

eyewitness has previously identified a person out of court. It would admit into evidence testimony of that identification. For example, testimony by a police officer that at a lineup John Doe identified the defendant as the man who robbed his store."). See generally, Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence, ¶ 801(d)(1)(C)[01], at 801-222 (1993) ("If at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the testimony of a person to whom the statement was made, and the statement can be given substantive effect."). Thus, Miller's statement should have been admitted as substantive evidence.

### c.

The government maintains that Brink is not entitled to a new trial because the district court's error, if any, was harmless. Like resolution of Brink's Sixth Amendment claim, resolving this issue depends on whether Scott was acting as a government agent while collecting information on Brink.

Under Federal Rule of Criminal Procedure 52(a) "any error, defect or variance which does not affect substantial rights shall be disregarded." Fed. R. Crim. P. 52(a)(West 1994). An error that does not implicate a constitutional right is harmless where it is "`unimportant in relation to everything else the jury considered on the issue in question as revealed in the record.'" United States v. Palmieri, 21 F.3d 1265, 1273 (3d Cir. 1994), petition for cert. filed Aug. 1, 1994 (No. 94-5463) (quoting Yates v. Evatt, 500 U.S. 391, 403 (1991)). Upon

reviewing the entire record, we believe that, provided Scott's testimony was properly admitted at trial, the district court's error was harmless.

Scott testified that, when they were cellmates, Brink confessed to the robbery. The bank tellers, Miller and Simpson, made positive in-court identifications[11] and Brink's friend,

_____

[11]. Simpson testified:

> Q: How do you know that Billy Brink robbed you on December 16, 1992?
>
> A: I could tell who he was. I could see through the ski mask. The holes around the eyes and the mouth were big enough to see. I could recognize his features, his voice, the way he walked, his mannerisms.
>
> Q: Now you have identified several characteristics. Did you know Billy Brink prior to December 16, 1992.
>
> A: Yes, I did.
>
> Q: And how was it that you knew him or knew of him?
>
> A: I knew of him all his life. My son coached him in midget football, I think junior high, and probably varsity football also. But, I just know that he -- you know, I have known of him.
>
> Q: Now, was he a customer of the Farmers National Bank?
>
> A: Yes, he was.
>
> Q: When was the last time you had seen him in the bank prior to December 16th.
>
> A: Probably around the first week in December he was in the bank.

Appendix at 94.

Miller testified:

William Rumbarger, testified that on the evening after the robbery, he saw Brink carrying two, three-quarter inch stacks of cash in large denominations. These, together with other circumstantial evidence, provide sufficient evidence of Brink's guilt.[12]

(..continued)

    Q:    And how is it that you were able to identify
          [Brink]?

    A:    Just -- when he came to the window, it was him.  I
          mean, from what I know of him and seen of him, it
          was Bill Brink.

Appendix at 110.

    Q:    [Y]ou knew him because one of his friends was
          dating your best friend.  Is that how you knew
          him?

    A:    That's how I knew who he was at first, yes.

    Q:    And then you also saw him play football.  Is that
          what your testimony is?

    A:    Yeah.  I saw him play football and, I mean, we
          went to two small high schools.  I mean, everybody
          knew who everybody was in the two schools.

Appendix at 114.

[12]. Claiming the pre-trial identifications of Miller and Simpson were subject to the same limiting instruction as Miller's statement regarding the robber's eye color, the government contends the jury was instructed not to view their testimony as substantive evidence, but instead to use it to judge their credibility. Consequently, the government maintains that limiting the use of Miller's statement about the robber's eye color, if error, was harmless because the court's instruction hurt the government's case more than the defendant's. Although we find the government's argument unconvincing, we agree the error was harmless.

If Scott did not violate Brink's Sixth Amendment rights his testimony was properly allowed into evidence. See Kuhlmann, 477 U.S. at 459 (evidence gained by luck or happenstance does not violate defendant's right to counsel). In that case, any error regarding the identification was harmless because Brink's confession coupled with the in-court identification and the circumstantial evidence provides sufficient evidence of his guilt. On the other hand, if Brink's rights were violated he is entitled to a new trial on that basis alone, see supra note 9, and we would not need to reach the evidentiary issue. Consequently, we hold that if, after an evidentiary hearing, the district court determines Scott did not violate Brink's Sixth Amendment rights, the district court's failure to admit Miller's statement of prior identification was harmless error.[13]

---

[13]. Brink raises two other issues on appeal. He claims the district court erred by not interrupting jury deliberations to allow him to demonstrate that the denim jacket, taken from his home and entered into evidence on the theory that it was worn during the robbery, did not fit him. After jury deliberations begin, a district judge has wide discretion in deciding whether to reopen a case. United States v. Golomb, 754 F.2d 86, 89 (2d Cir. 1985); see Drummond v. United States, 350 F.2d 983, 991 (8th Cir. 1965) (Blackmun, J.), cert. denied sub nom. Castaldi v. United States, 384 U.S. 944 (1966). The court denied Brink's request because he offered no excuse for failing to raise the issue earlier, and because it believed interrupting deliberations might suggest to the jurors that the jacket was more important than other pieces of evidence. We find no abuse of discretion here. See Fernandez v. United States, 329 F.2d 899, 903 (9th Cir.), cert. denied, 379 U.S. 832 (1964); cf. United States v. Burger, 419 F.2d 1293, 1295 (5th Cir. 1969) (trial court should exercise its discretion with caution).

Brink also contests the district court's ruling that allowed two experts to testify about similarities between items seized from Brink's home and those identified on the bank's surveillance photographs. Brink argues that because these experts were unable to testify to a reasonable degree of scientific certainty, their

# IV. Conclusion

For the foregoing reasons, we will vacate the judgment of the district court and remand this case for further proceedings not inconsistent with this opinion.

(..continued)
testimony should have been stricken as conjecture.  We find no merit in this argument.  The decision whether to admit expert testimony is within the broad discretion of the trial court, United States v. Downing, 753 F.2d 1224, 1229 (3d Cir. 1985); United States v. Cyphers, 553 F.2d 1064, 1072 (7th Cir.), cert. denied, 434 U.S. 843 (1977), and a court generally does not abuse its discretion where the expert bases its opinion on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue, see Deluca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941, 955 (3d Cir. 1990); see also Michael H. Graham, Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness, 1986 U. Ill. L. Rev. 43 (reasonable degree of scientific certainty refers to whether the expert relied on a theory accepted by a recognized segment of the particular field to which the expert belongs); cf. Cyphers, 553 F.2d at 1072-73 ("[A]n expert's lack of absolute certainty goes to weight of testimony, not its admissibility."); Stutzman v. CRST, Inc., 997 F.2d 291, 296 (7th Cir. 1993).