In the Matter of the EXTRADITION OF Johann (John) BREYER.

Misc. No. 14–607–M.

United States District Court, E.D. Pennsylvania.

Signed July 23, 2014.

Andrea Foulkes, U.S. Atty's Office, Philadelphia, PA, for Plaintiff.

Dennis E. Boyle, Boyle Litigation, Camp Hill, PA, Kenneth E. Raleigh, Boyle Litigation, Philadelphia, PA, for Defendant.

### *CERTIFICATION OF EXTRADITION AND ORDER OF COMMITMENT*

TIMOTHY R. RICE, United States Magistrate Judge.

Pursuant to its treaty with the Federal Republic of Germany, the United States seeks an extradition certification for Johann (John) Breyer based on Breyer's role, as a Nazi "Death's Head Guard," in the murder of 216,000 European Jews at the Auschwitz II–Birkenau death camp. For the following reasons, I will grant the United States' request and certify Breyer's extradition to stand trial in Germany for mass murder. Like other accused war criminals, Breyer must submit to the judgment of law for his alleged role in Nazi atrocities against humanity. No statute of limitations offers a safe haven for murder.[1]

---

1. Breyer claims his advanced age and status as a camp guard, not an officer, impacts this proceeding. Response to Government's Memorandum of Law in Support of Extradition (doc. 20) ("Resp.") at 9. Although Germany has delayed Breyer's prosecution for decades, that issue has no bearing on the limited inquiry I must conduct to certify extradition. 18 U.S.C. § 3184. Moreover, the mere passage of time cannot diminish the raw horror of the crimes charged.

## I. INTRODUCTION

As noted by Justice Robert H. Jackson, the chief prosecutor at the Nuremburg war crimes trials, crimes such as those alleged here are "so calculated, so malignant, and so devastating that civilization cannot tolerate their being ignored because it cannot survive their being repeated." Nuremberg Opening Statement, Nov. 21, 1945, cited in Tusa, *The Nuremberg Trial,* (1st Am. Ed.1984), at 155. Although Breyer claims he was unaware of the massive slaughter at Auschwitz, and then that he did not participate in it, the German allegations belie his claims. Given Breyer's role as an elite S.S. armed guard at a camp designed and operated almost exclusively as a killing center for Jews, Germany has established probable cause of Breyer's complicity in the mass murders at Auschwitz.

An understanding of three things is essential to evaluate the charges against Breyer: (1) the structure and purpose of the camp; (2) the mechanics of processing, murdering, and cremating the victims; and (3) the role of the S.S. death guards in camp operations. As outlined by Germany, a death camp guard such as Breyer could not have served at Auschwitz during the peak of the Nazi reign of terror in 1944 without knowing that hundreds of thousands of human beings were being brutally slaughtered in gas chambers and then burned on site. A daily parade of freight trains delivered hundreds of thousands of men, women, and children, most of whom simply vanished overnight. Yet, the screams, the smells, and the pall of death permeated the air. The allegations establish that Breyer can no longer deceive himself and others of his complicity in such horror.

### A. Camp Operation and Set Up

Concentration camps were first set up in 1933, and were initially used to silence political opponents without the obstacle of constitutional protections.[2] Certified translation of 6/17/13 Arrest Warrant ("War.") at 124, 126; Grunberger, *Hitler's S.S.* (1st Am. Ed.1971) ("Grunberger") at 21. From the very beginning, the camps were staffed by the special "Schutzstaffel," or "S.S.," and the Gestapo. Grunberger at 21, 24. The Gestapo was the Nazi's secret political police force. Grunberger at 25.

---

**2.** The government has submitted five attachments in support of its Request for Extradition: (1) a June 6, 2013 Declaration from Elizabeth M. Kiingi, from the Legal Advisor's Office at the U.S. Department of State, regarding Germany's compliance with our nations' Extradition Treaty in this matter ("Kiingi Decl."); (2) a certified translation of a Declaration from Gerhard Heindl, Sr. Public Prosecutor in Weiden, Germany, regarding the basis for the charges against Breyer ("Heindl Decl."); (3) a certified translation of the Arrest Warrant issued by the District Court of Weiden, Germany on June 17, 2013, for Breyer ("War."); (4) a certified translation of an expert report drafted by Dr. Stefan Hordler, a consultant to Weiden's Public Prosecutor's Office ("Exp. Rep."); and (5) a June 12, 2014 Declaration from Tom B. Heinemann, of the Legal Advisor's Office at the U.S. Department of State, supplementing the June 6, 2013 Declaration from Ms. Kiingi ("Heinemann Decl.") (doc. 3, 9). Although they are five separate documents with distinct pagination, the government has also Bates-stamped them, and these are the page numbers used herein.

Many facts asserted within the Prosecutor's Declaration and Arrest Warrant are supported by specifically cited documentary evidence, or testimony that has been found credible in previous Nazi prosecutions. To the extent that specific support for allegations was not provided, and the prosecutor relies on general knowledge about World War II that may not be as prevalent in the United States as it is in Germany, I have consulted several well-known English-language secondary sources, to confirm that these averments are generally accepted as a matter of historical record.

The S.S. began as an armed wing of Hitler's political party, its "staff guard." Grunberger at 12, 21, 30. The "S.S." was separate from the regular German military—army, navy, etc.—that fought against the United States in World War II, although by the end of the war it did have units that fought on the front. Grunberger at 31, 65–70. The concentration camps' guards were all members of the "S.S.-Totenkopfsturmbann," i.e. the S.S.' "Death's Head" unit. War. at 124; Grunberger at 23.

During World War II, the camps' functions grew to include housing prisoners of war, foreign civilians, and those the Nazis considered "asocial," like homosexuals, and Jews. War. at 126; Grunberger at 24. On January 20, 1942, the infamous "Wannsee Conference" took place in Berlin, and the national leader of the S.S., Heinrich Himmler, was charged with ethnically cleansing all German territories.[3] War. at 124, 157; Grunberger at 83; see translation of Protocols of the Wannsee Conference, reprinted in Berenbaum, ed., *Witness to the Holocaust; an Illustrated Documentary History of the Holocaust in the Words of its Victims, Perpetrators, and Bystanders* (HarperCollins 1997) at 165. From then on, the S.S. and Gestapo used the concentration camps to implement Hitler's "final solution" to the Jewish question, i.e. the extermination of all Jews living in territories under Nazi control. War. at 124; Grunberger at 72.

The original plan was to exterminate the Jewish people by working them to death. War. at 124, 132; Grunberger at 85.[4] After occupying a country, the Nazis would segregate the individuals to exterminate through various means, like imprisonment or ghettoization. Berenbaum at 168 (Wannsee Protocols). Once contained in one place, the victims would be "relocated" by train to concentration camps, including Buchenwald in Germany and Auschwitz in Poland. War. at 125; see Berenbaum at 217 (translation of July 22, 1942 Order for "Resettlement" of Jews in Warsaw ghetto). Upon arrival by train to Auschwitz Concentration Camp (whose motto, "Work Makes You Free," was inscribed on the gate), workers underwent "selection" and were found either fit to work or not. War. at 151; Exp. Rep. at 363; Grunberger at 85. Those not fit to work long hours on starvation rations were murdered on site. *Id.*

Both Auschwitz and Buchenwald grew significantly over the course of World War II, and Auschwitz grew at one point into three administratively separate camps. War. 127; see also *Breyer v. Meissner*, No. 97–6515, 2002 WL 31086985, at *8 (E.D.Pa. Sept. 18, 2002). Auschwitz I, the oldest part, was used primarily as a forced labor camp, although it also was the site of the original experimentations with mass gas poisonings, and it had one crematorium in which victims were gassed between 1940 and July 1943. War. at 128; see also *Breyer*, 2002 WL 31086985, at *8. Auschwitz II (a.k.a. Auschwitz–Birkenau), was originally intended to house Soviet prisoners for forced labor, but later primarily served as a death camp, at one point maintaining six working gas chambers. Map at 411; see also *Breyer*, 2002 WL 31086985,

---

**3.** The Germans cite to minutes of this meeting, which have been preserved, to support their charge that the S.S. was responsible for mass murder. War. at 149.

**4.** *See also* Berenbaum at 167–68 (citing translation of Wannsee Protocol, "the Jews are now to be allocated for labor to the East ... in the course of which action a great part will undoubtedly be eliminated ... [t]he possible remnant will ... have to be treated accordingly.").

at *8. Auschwitz III (a.k.a. Auschwitz–Monowitz) was intended for more forced labor at sites owned by private industry. War. at 126; *see also Breyer*, 2002 WL 31086985, at *8. Based on the Nazi regime's needs at any given moment, e.g. for slave labor or more troops at the front line, the size of the inmate population and staff at Auschwitz grew and contracted. *See, infra*, at § IV.B.3.b.2. At all times, however, it was guarded by the Death's Head guard unit, War. at 124; Grunberger at 23, in which Breyer served.

## B. *Mechanics of Murder*

After a "relocation" train ride in which large numbers of passengers died from the inhumane conditions on the train itself, victims arriving in Auschwitz would be unloaded. Exp. Rep. at 355 (citing pictures of the unloading process maintained at Yad Vashem Photo Archive). Early in the war, trains were unloaded only at night, so that spotlights could be used to ensure no prisoners escaped during the unloading process, and the packed trains would sometimes sit for an entire day before the passengers could disembark. *Id.* at 374 (citing 1960 statement from former Death's Head guard). No later than the spring of 1944, however, the rail-line was extended inside the barbed wires of Auschwitz II–Birkenau, and the unloading

then took place during the day as well. War. at 131; Exp. Rep. at 374.

Inside Auschwitz II–Birkenau, two cars could be unloaded at once, directly onto ramps where high-ranking S.S. members, usually camp doctors, would pick out those fit for work, which was limited to a small number of women and able-bodied men over 13 (sometimes 16), ranging from five percent to 40% of the total passengers.[5] War. at 131–32; Exp. Rep. at 376–77. During this "selection" process, the armed S.S. guards would form a ring around the trains, preventing the passengers from escaping or hiding. War. at 131; Exp. Rep. at 376 (displaying photo of S.S. guards during selection). Those not selected for forced labor, including all women with small children, the sick, and the elderly, were told to leave their luggage for later, that they were going to be bathed and fed immediately. War. at 131; *see also* Berenbaum at 182 (translation of an excerpt from the memoir of Rudolph Hoss, who served as commandant of Auschwitz). They were told to completely undress, and then packed into rooms with multiple (fake) shower heads. *Id.* The doors were locked behind them and they were suffocated with poisonous gas. *Id.*

The gas used, Zyklon B, contained hydrogen cyanide, which causes internal suffocation leading to death.[6] War. at 127–28.

---

5. The Arrest Warrant states that much of the evidence regarding the standard murder procedure at the Nazi concentration camps, which is not fully re-stated, has been introduced and found credible during previous prosecutions. War. at 152. One example cited by Germany's expert, Dr. Hordler, is a photo album, comprised of 193 photographs, that was created by the Records Department of the Auschwitz II–Birkenau Political Department during the Hungarian Action entitled "Resettlement of the Jews from Hungary." Exp. Rep. at 363. The album has five sections: "Arrival of a Transport," "Sorting," (which is divided into sub-sections "Men at Arrival," and "Women at Arrival,"), "After

Sorting," (which is divided into sub-sections "Men Still Fit for Use," "Women Still Fit for Use," "Men No Longer Fit for Use," and "Women and Children No Longer Fit for Use"), "After Delousing" (also subtitled "Induction into the Work Camp"), and "Effects." *Id.*

6. The specific information regarding Zyklon B has been established by the German courts in other Nazi prosecutions, and its chemical properties have been widely studied in Germany. War. at 152. In addition, its use at Auschwitz and basic properties were confirmed by Rudolph Hoss in his memoir. Berenbaum at 183.

In small doses, hydrogen cyanide causes nausea, vomiting, anxiety, confusion, dizzy spells, and headaches. War. at 128. In medium doses, it causes irregular breathing and heart trouble. *Id.* In large doses, hydrogen cyanide causes sweating, protuberant eyeballs, seizures, bloody mouth foam, involuntary urination and defecation, and finally loss of consciousness, coma, and death. *Id.* The Zyklon B took varying amounts of time to distribute lethal doses of hydrogen cyanide throughout the gas chambers, so although most people within the chambers died within 15–20 minutes, the killing process was only ended after 20–40 minutes. *Id.* Some people located farther away from poisonous gas sources took longer to ingest a lethal concentration, thereby suffering more symptoms as well as previewing their own deaths in the bodies of those around them. *Id.* The screams and cries of the victims could be heard outside the gas chambers, and when all victims had died and the chamber was opened to be cleared for the next round of murders, some bodies were found trampled by others who had sought to gasp for air at the ceiling of the chambers. *Id.*

After they had been murdered, the victims were cremated. War. at 128; Berenbaum at 182–83. Crematoriums were located above each of the basement-level gas chambers at Auschwitz II–Birkenau. *Id.* Because of the large number of murders at Auschwitz II–Birkenau during this time period, the crematoriums were busy, consistently filling the air with the distinct smell of burning bodies throughout 1943

and 1944. Exp. Rep. at 374 (quoting eyewitness statement). Although Auschwitz II–Birkenau's four crematoriums could burn 4,420 bodies per day, during the "Hungary Action," which took place from May through July of 1944, there were so many murders that cremations also had to take place in open pits nearby.[7] War. at 128–29; Berenbaum at 183.

Germany occupied Hungary on March 19, 1944. War. at 132. Between May 14, 1944 and July 22, 1944, 137 trains came from Hungary to Auschwitz II–Birkenau, packed with 437,402 Jews.[8] War. at 133; Berenbaum at 174 (noting that the Hungary Action was sometimes called the Hoss Action, because Rudolph Hoss, the former commandant of Auschwitz, was credited with its success). Between the people that died on the trains and those selected for forced labor, the German prosecutor estimates that about two-thirds of the arriving people were immediately gassed to death, or about 288,685 people in a two-month time period. War. at 133.

#### C. *Role of Guards*

Death's Head guards at Auschwitz played an essential role. War. at 151; Grunberger at 85–86. They were responsible for: general guard duty, military training, duty on the watchtowers, guard duty in the large and small chain of guards around the camp, supervising and guarding the prisoner laborers, and guarding

---

**7.** The crematoria's capacity was established using documents maintained in Munich's "Institut fur Zeitgeschichte." War. at 152.

**8.** The Request for Extradition includes lists of the trains that arrived each day during the Hungary Action, including the number of passengers that were aboard at the start and the estimated number that were immediately killed upon arrival at Auschwitz. War. at

134–140. These numbers appear to be based on reports made from various train stations along the route. *Id.* at 157. The Request also notes that, during approximately the same time period that the Hungary Action took place—between May and October 1944—about 138 people brought in from Germany and 16,510 people arriving from Czechoslovakia were also killed. *Id.* at 140–42.

the arriving prisoners.[9] War. at 151. During "selection," armed Death's Head guards would ring the arrival ramp and escort the murder victims to the crematories or the quarters for slave labor. *Id.* Each Death's Head unit member performed all duties on a rotating basis, and rotated shifts for stand-by duty and leisure time as well. *Id.*

## II. *GOVERNING STANDARDS*

 "[A]ny magistrate judge" can hear an extradition request by a foreign government with whom the United States has a treaty. 18 U.S.C. § 3184. Extradition itself, however "is an executive rather than a judicial function." *Hoxha v. Levi,* 465 F.3d 554, 560 (3d Cir.2006) (citing *Sidali v. INS,* 107 F.3d 191, 194 (3d Cir. 1997)). My review is limited to determining: (1) whether this Court has jurisdiction over Breyer; (2) whether the offense charged is covered by the applicable treaty; (3) whether that treaty is in force; and (4) whether there is sufficient evidence to support a finding of probable cause for the charges against him. *Id.* (citing *Sidali,* 107 F.3d at 195; *Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925)).

President Carter signed the United States' first extradition treaty with the Federal Republic of Germany in 1978. Extradition Treaty, U.S.-Ger, June 20, 1978, T.I.A.S. No. 9785 (entered into force August 29, 1980) ("1978 Treaty"); *see also* Supplementary Extradition Treaty, U.S.-Ger., Oct. 21, 1986, 1909 U.N.T.S. 441 (entered into force March 11, 1993) ("1986 Supplemental Treaty"); Supplementary Extradition Treaty, U.S.-Ger., April 18, 2006, T.I.A.S. 10–201.9, (entered into force Feb. 1, 2010) ("2006 Second Supplemental Treaty"). For an offense to be extraditable, it must be punishable under both countries' laws by more than one year's "deprivation of liberty." Extradition Treaty, Art. 2(1), (2), as supplemented by 1993 Supplementary Extradition Treaty, Art. 1(a).

## III. *PROCEDURAL HISTORY*

Breyer's service to the S.S. has been the subject of litigation before; in 1993, the District Court held Breyer had illegally obtained his visa to the United States by misrepresenting his service in the S.S., and cancelled his certificate of naturalization. *United States v. Breyer,* 829 F.Supp. 773, 779 (E.D.Pa.1993), *aff'd in relevant part,* 41 F.3d 884, 891 (3d Cir.1994). Breyer was not deported, however, because he was able to establish that his mother had been born in Pennsylvania, thereby entitling him to United States citizenship. *United States v. Breyer,* 841 F.Supp. 679, 685 (E.D.Pa.1993) (finding Breyer's mother was born in the Philadelphia); *Breyer v. Meissner,* No. 97–6515, 2002 WL 31086985, *15–*16 (E.D.Pa. Sept. 18, 2002) (holding Breyer derived citizenship through his mother), *aff'd,* 350 F.3d 327, 338 (3d Cir. 2003).[10]

---

**9.** Germany notes the selection procedure "has been closely investigated and clarified in the past in a number of criminal procedures," and cites to 1976 and 1977 proceedings in its warrant. War. at 149, 151. It also cites to regulations regarding the discipline of guards and prisoners and training of prisoners that have been preserved in Germany, as well as corroborating information provided by Rudolph Hoss and testimony from three other former S.S. members from 1960, 1961, and 1962. War. at 151.

**10.** Some of the Findings of Fact made in the District Court's 2002 opinion are inconsistent with the evidence alleged by Germany in this case. *See, e.g., Breyer,* 2002 WL 31086985, at *8 (finding that Breyer was transferred to Auschwitz as a punitive measure sometime after April 1944). I am not bound by those previous findings for three reasons.

The warrant for Breyer's arrest was issued in Weiden, Germany, on June 17, 2013.[11] War. at 123. The Federal Republic of Germany first requested his extradition via Diplomatic Note on July 31, 2013. Kiingi Decl. at 4. In response to a Diplomatic Note from our government, Germany clarified that its murder statute has remained unchanged since the time Breyer's alleged acts were committed, and the charges, for "complicity in murder," include "aiding" in murder. *Id.* at 6–7. On June 4, 2014, Germany sent a follow-up Diplomatic Note that included with it additional evidence: (1) an expert report, with a certified English translation, detailing the German government's theory—and the evidence in support of its theory—that Breyer served at Auschwitz II–Birkenau, and participated in the murders voluntarily;[12] (2) certified translations of six pieces of documentary evidence; and (3) a map and digital reproduction showing the layout of Auschwitz II–Birkenau. *Id.* at 8.

First, there are different standards of proof in these different proceedings. I need only find that the government has proffered enough proof to establish probable cause, while the Findings of Fact in Breyer's previous case were subject to the preponderance of evidence standard. *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir.2006); *Breyer,* 2002 WL 31086985, at *13.

Second, "the evidence regarding Breyer's guard service at Auschwitz has been more fully developed by the German authorities in the decade since that proceeding." Government Response to Motion for Reconsideration of Bail Pending Extradition Proceeding (doc. 16) at 6; *Hamilton v. Leavy,* 322 F.3d 776, 787 (3d Cir.2003). Additional evidence has been provided by the German government in support of its June 17, 2013. Arrest Warrant that was not available in Breyer's 2002 proceeding. *See, e.g.,* Exp. Rep. at 429 (certified translation of December 22, 1943 "Greetings from Auschwitz" message from Breyer and other ethnically German Slovakian S.S. members published in local newspaper). This evidence has caused the United States to change its position with regard to certain facts to which it stipulated in the previous proceeding. *See, e.g., Breyer,* 2002 WL 31086985, at *8 (noting that its finding, that Breyer was transferred to Auschwitz as a punitive measure sometime after April 1944, is based in part on the parties' agreed-upon facts). Some of this evidence directly contradicts Breyer's previous testimony, upon which the court also relied in making its determination. *See, e.g., Breyer,* 2002 WL 31086985, at *8 (noting that its finding that Breyer was transferred to Auschwitz as a punitive measure sometime after April 1944 is also based on Breyer's testimony).

Finally, the German Arrest Warrant also presents evidence sufficient to support an alternative theory of aiding and abetting murder even if, as the previous court found, Breyer served as a Death's Head guard at Buchenwald from February 10, 1943 to spring 1944 and at Auschwitz I from spring 1944 through August 1944. *See, infra,* at § IV.B.3.d.

11. The Arrest warrant sets out the German prosecutor's basis for jurisdiction over the crimes and Breyer: 1) he was carrying out responsibilities for the German government at the time of the crimes; 2) he obtained German citizenship in 1946; 3) the initiation of the conspiracy took place in Germany; and 4) there were German citizens among the victims. War. at 159.

12. The expert report was prepared by Dr. Stefan Hordler, who earned his M.A. and Ph.D. at Humboldt University in Berlin and has spent the last 15 years researching the history of the S.S. Death's Head Units and Nazi camp guards, 1933–1945. Exp. Rep. at 346. He has served as a Research Fellow at the German Historical Institute since October 2012, and previously worked at the Institute of Contemporary History of the University of Vienna. *Id.* In 2009, Dr. Hordler held a Ben and Zelda Cohen Fellowship at the Center for Advanced Holocaust Studies of the U.S. Holocaust Memorial Museum, and in 2013 his dissertation on the final stage of the Nazi concentration camp system, 1944–45, won the First Tiburtius Prize for the best dissertation completed at all Berlin universities in all academic fields. *Id.*

Breyer was arrested on June 17, 2014, and at a hearing on June 18, 2014, requested a continuance until August 21, 2014. *See* Order of June 18, 2014 (doc. 8). Pursuant to a July 21, 2014 agreement between the parties and in accordance with Supreme Court precedent, this Opinion was issued without further hearing, based on the papers submitted and counsels' representations that neither Breyer nor the United States on behalf of Germany intended to offer additional evidence. *See Glucksman v. Henkel,* 221 U.S. 508, 512–13, 31 S.Ct. 704, 55 L.Ed. 830 (1911) (rejecting argument that deposition was required, and finding extradition proper based on translated papers). On July 22, 2014, the United States Attorney's office provided me with the official ribboned/sealed Request with certifications, which was admitted into evidence without objection.

## IV. *DISCUSSION*

### A. *Legal Standard for Probable Cause*

 The probable cause standard used in extradition hearings is identical to that used in federal criminal preliminary hearings. *Sidali v. I.N.S.,* 107 F.3d 191, 199 (3d Cir.1997). The government must set forth only "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Id.* at 199 (citing *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973)). In an extradition hearing, this evidence can be based entirely on authenticated documentary evidence and/or written statements by foreign prosecutors or judges summarizing the evidence expected to be used. *Rice v. Ames,* 180 U.S. 371, 375–76, 21 S.Ct. 406, 45 L.Ed. 577 (1901).

### B. *Proffered Evidence*

#### 1. *The murders happened*

 There is no dispute that millions of people were murdered at Auschwitz. Germany has produced sufficient evidence to establish probable cause to believe that hundreds of thousands of specific murders occurred at Auschwitz during the time Breyer was serving there as a Death's Head guard. War. at 157.

On July 30, 1943, officers at Auschwitz were given permission to transport Zyklon B from Dessau to Auschwitz. Exp. Rep. at 377 (citing contemporaneous documentation). The transport was accomplished by truck that day. *Id.* Two days later, on August 1, 1943, five trainloads, each with 2,000 Jews, arrived from the ghettos of Bendzin and Sosnowitz. *Id.* More than 1,500 people out of each trainload were murdered immediately, and more mass transports and killings occurred in the following days. *Id.* Because this caused the guards to work day and night securing transports and killing people, they were rewarded with a day off on August 7–8, 1943. *Id.* at 378 (citing the August 6, 1943 Garrison Order granting the day off in "recognition" of the "special action"); *see also* Berenbaum at 271–72 (excerpt from an eyewitness report sent to the President in November, 1944, by the War Refugee Board); Tusa at 200 (describing eyewitness testimony of prisoner that spent three years in Auschwitz).

#### 2. *Breyer is the person sought*

The government alleges, and Breyer does not dispute, that he is the person sought in the Arrest Warrant. *See* Audio recording of June 18, 2014 proceedings (doc. 6). The government offers pictures of Breyer from 1952, 1957, 1995, and 2011, as well as an affidavit from a retired United States government trial attorney who was involved in litigation against Breyer from 1997 through 2004. Heindl Decl. at

167–76 (affidavit of Robert J. Groner, attached as "Annex 3").

### 3. *Breyer took part in the murders*

Breyer is charged with 158 counts of contributing to murder. War. at 157. Germany alleges he acted voluntarily to facilitate the deaths, by being "part of an organization which purposefully executed the orders to carry out the murders within the chain of command." *Id.* at 158. According to Germany, Breyer's specific role within the concentration camp is not determinative of his guilt because, akin to liability for conspiracy, any action that kept "the extermination system running," was enough to participate, and create culpability.[13] *Id.*

### a) *Breyer was in the S.S. Death's Head unit*

During 1938 and 1939, the Nazis dismantled Czechoslovakia, incorporating the piece inhabited mostly by ethnic Germans, and forming an ally out of the balance, the Slovakian Republic, within which they could exert substantial influence, in March 1939. War. at 125; *Breyer*, 2002 WL 31086985, at *2. Breyer received eight years of schooling in his home town in what became Slovakia, and two additional years at a secondary school in another location. War. at 129. After completing ten years of education, Breyer returned home to work on his parents' farm. *Id.*

Franz Karmasin, the head of the Slovakian branch of the Nazi party, and a former member of the Waffen–S.S., urged ethnically German Slovakians to volunteer for the S.S. in a proclamation made on November 20, 1942. *Id.* at 130; *Breyer*, 2002 WL 31086985, at *3. Breyer, 17 at the time, was one of the first volunteers to respond to his call; military service was not mandatory until age 18, but voluntary service in the S.S. was permitted earlier. Exp. Rep. at 351; *Breyer*, 2002 WL 31086985, at *5–*6. Compulsory military service for ethnic Germans living in Slovakia was established only in 1944. *Id.* Breyer was medically examined on December 6, 1942, and left Slovakia with 301 other volunteers in February 1943.[14] War. at 130; *Breyer*, 2002 WL 31086985, at *6.

### b) *Breyer was stationed at Auschwitz II–Birkenau*

Breyer has admitted to being a member of the 8th Company of Auschwitz's Death's Head guard unit as of spring 1944. *Breyer*, 2002 WL 31086985, at *8. Dr. Hordler's report cites a February 1944 document that shows Auschwitz's 8th company was housed at Auschwitz II–Birkenau in April 1943.[15] Exp. Rep. at 366. The Germans

---

**13.** The Arrest Warrant also explains that the defense of acting on orders is not available to Breyer because the genocidal orders were patently immoral and because military penal law at the time excused culpability only for those orders that had a military purpose. War. at 158. It also forecloses defending against the charges on the basis of a "state of emergency," because there is evidence Breyer could have easily transferred to another unit of the S.S. *Id.* Finally, the Warrant explains that previous investigations into Nazi crimes carried out in Germany have shown that refusing to participate in murders at the concentration camps did not result in risk of life and limb. *Id.* at 159. It further notes no statute of limitations blocks the prosecution. *Id.*

**14.** The German Arrest Warrant states that documentary evidence of the general circumstances of recruitment of volunteers for the S.S. in Slovakia has been maintained, and relied upon in previous prosecutions. War. at 152.

**15.** According to Dr. Hordler, in August 1943, Auschwitz's 12 permanent companies were located at:

Auschwitz I (original camp): 1st, 2nd, 3rd, 4th, and 2nd Headquarters' Company
Auschwitz II (Birkenau): 6th, 7th, 8th, canine unit, and 1st Headquarters' Company

also cite evidence that this unit was re-named the 3rd unit in July 1944, and later renamed again, as staffing needs and the organization of the camp changed. War. at 130; Exp. Rep. at 364, 366.[16] At all times, however, this unit was stationed at Auschwitz II–Birkenau. Exp. Rep. at 347. Contemporaneous documents establish this company was led by the same first lieutenant after the renumbering, and used the

> Auschwitz III (Buna and external camps): 5th and Buna Guard Company
> Exp. Rep. at 364

**16.** The Germans have cited contemporaneous documents to show that, without changing duties or location, Auschwitz's 8th company was renumbered the 3rd company between July 10 and 14, 1944, in response to Auschwitz being split into Auschwitz I, Auschwitz II–Birkenau, and Auschwitz III. Exp. Rep. at 366 n. 28. This renumbering was made necessary by a number of factors, including the growth of Auschwitz III, whose two companies of personnel had grown to 7. *Id.* at 365. As Dr. Hordler explains, with these additional companies, both Auschwitz I and III had companies numbered 1st–4th, and Auschwitz II and III had a 7th company (the 6th company, which had been located at Auschwitz II, had dissolved, so Auschwitz III's 6th company was not a double). *Id.* This was confusing because the companies would sometimes refer to themselves as, *e.g.*, "Auschwitz—7th Company." *Id.* After July 14, 1944, across service departments, the camp number as well as the company number were supposed to be identified in a unit's title. *Id.* at 366. In Auschwitz II–Birkenau, the following changes were made, according to contemporaneous documents cited by Dr. Hordler:

> 1st Headquarters Company 1st ——➤ S.S. Death's Head Battalion Auschwitz II
> [6th company had been dissolved in December 1943]
> 7th Company 2nd ——➤ /S.S. Death's Head Battalion Auschwitz II
> 8th Company 3rd ——➤ /S.S. Death's Head Battalion Auschwitz II
> [4th S.S. Death's Head Battalion Auschwitz II added in July 1944]
> Canine unit Canine ——➤ Unit S.S. Death's Head Battalion Auschwitz II
> . *Id.*

same official stamp on troop muster rolls. *Id.* at 366–67. When Auschwitz I and II were consolidated on November 25, 1944, the companies were renumbered a final time, and the 3rd (formerly 8th) company became the 7th.[17] *Id.* at 367.

The Germans attach evidence that Breyer's service in Auschwitz II–Birkenau actually began in 1943.[18] War. at 130. Al-

**17.** The 1st through 5th companies at Auschwitz I retained their numbering, while the companies at Auschwitz II were re-numbered. Former 2nd Company Auschwitz II was dissolved due to the transfer of so many personnel, so the following changes were made:

> 1st /S.S. Death's Head Battalion Auschwitz II 6th ——➤ /S.S. Death's Head Battalion Auschwitz
> 3rd /S.S. Death's Head Battalion Auschwitz II 7th ——➤ /S.S. Death's Head Battalion Auschwitz
> 4th /S.S. Death's Head Battalion Auschwitz II 8th ——➤ /S.S. Death's Head Battalion Auschwitz

Exp. Rep. at 367, 380 (citing November 24, 1944 Garrison Order No. 29/44).

**18.** Two pieces of evidence show Breyer was stationed at Auschwitz in 1943. The first is a holiday greetings message from Breyer and other ethnically German Slovakian S.S. members published in a local Slovakian newspaper on December 22, 1943. Exp. Rep. at 429 (certified translation includes "S.S.-manner send greetings from Auschwitz," and "the following S.S.-manner send wishes for a joyous holiday and a Happy New Year . . . Johann Brejer (Neuwalddorf)"). The German prosecutor and his expert assert that "Brejer" in that document refers to Breyer because it is an alternate spelling that is pronounced identically. Heindl Decl. at 79; Exp. Rep. at 369. Dr. Hordler also asserts no other Breuer, Breyer or Brejers enlisted in the S.S. from Neuwalldorf, and that several of the other men listed in the message joined the S.S. on the same date as Breyer from the same area of Slovakia. Exp. Rep. at 369. The other evidence that Breyer started at Auschwitz in 1943 is an analysis conducted by Dr. Hordler regarding the cohort with whom Breyer began his service in the S.S., which suggests they were all transferred from Buchenwald to

though Breyer has previously testified that he deserted the S.S. in August 1944, Germany has produced new evidence that Breyer remained a member of this unit in December 1944. War. at 153; Exp. Rep. at 380, 453 (citing December 29, 1944 records of American counterintelligence that

refer to Breyer as a Death's Head guard at Auschwitz II–Birkenau). The new information, not provided in immigration proceedings against Breyer, supports Germany's charges and establishes probable cause that Breyer was still a member of this unit as of January 1945.[19] Id.

Auschwitz II–Birkenau, together, in July 1943, pursuant to a single order. Id.

**19.** The document, a January 17, 1945 request for an increase in Breyer's "Dependents' Support" pay from the S.S., was discredited by the District Court in 2002 because it overstates the size of Breyer's family farm and mis-states his parents' birthdates. Breyer, 2002 WL 31086985, at *8 n. 13; Exp. Rep. at 420 (translation of a January 17, 1945 Dependents' Support request). The District Court doubted the document's authenticity because of these mistakes, but in doing so made an implicit credibility determination regarding Breyer himself: that Breyer would not have inflated the size of his family's farm, or overstated his parents' age, in an effort to strengthen his case for additional benefits. The new information provided by the German government in this Extradition Request will require a trial court to assess Breyer's credibility, and therefore the authenticity of this document.

The Arrest Warrant details the many inconsistent statements Breyer has made about his time in the S.S. In May or June of 1951, Breyer represented to U.S. immigration authorities that he served between September 1944 and March 1946 in the German Infantry, and denied ever being a member of the S.S. War. at 144. On March 26, 1952, he stated in a hearing regarding his potential immigration to the U.S. that he had been a member of the S.S. between 1943 and 1945, but only spent two weeks in a Death's Head guard unit and the rest of the time in an S.S. unit fighting at the front. Id. When questioned by the Vice Consul at the U.S. regarding his immigration application, he failed to mention any time spent as a Death's Head guard. Id. On May 13, 1952, Breyer signed a statement under oath that he had never been a member or participant in a movement that is or had been hostile to the United States or the form of the government of the United States, never helped with the persecution of anyone because of race, religion, or ethnicity, and never supported this. Id. Because of the

falsity of this statement, in 1993 he was found by the United States District Court for the Eastern District of Pennsylvania to have obtained his visa fraudulently. Breyer, 829 F.Supp. at 779.

In a November, 1991 deposition taken in what turned out to be a 15–year–long, unsuccessful effort by the United States government to strip him of citizenship, Breyer made several statements the German prosecutor deems inconsistent with the evidence collected by German authorities. War. at 153–54. Breyer claimed that, after being required to join the S.S. at age 17, he served with the guards at Buchenwald concentration camp in the 8th company, and then afterwards spent a few months in the 4th company at Auschwitz. Id. at 145. He testified that he was entitled to two vacation weeks per year, and took his first vacation early at the end of 1943. Id. Breyer also testified he was transferred to Auschwitz for disciplinary reasons, in the fall of 1944, only after he tried to evade his S.S. service by telling his superiors his mother was sick and he needed to return home to tend to her. Id. He said that, at Auschwitz, he was promoted to private first class at the end of 1944, but the only guard duty he ever performed was outside of the camp. Id. at 146. He admitted to escorting prisoners to construction work sites three or four times. Id. He claimed "he heard nothing that suggests that prisoners would be executed in the camp." Id. at 147. He claimed the guards never discussed what was happening in the camp, and that he had never witnessed a "selection." Id. at 148. According to Breyer's 1991 deposition, he learned people had been gassed to death in his camp only after he had immigrated to the United States almost a decade later. Id. at 149. He claimed that when he was finally granted leave in December 1944 or January 1945, he deserted the S.S. by remaining at home for three months without authorization. Id. at 145.

At a Court proceeding related to his immigration case, Breyer testified he was stationed

Breyer most likely began his service as a Death's Head guard in Auschwitz II–Birkenau on July 23, 1943. As the government's expert, Dr. Hordler, explains, at the beginning of July, 1943, a group of Ukrainian guards in Auschwitz's 8th Company deserted their posts. *Id.* at 347, 368. The Ukrainian guards were subsequently transferred to Buchenwald. *Id.* at 352, 369. Breyer's cohort of ethnically German Slovakians, with whom he had begun service on February 10, 1943, and with whom he had trained at Buchenwald, were all sent to Birkenau to replace the Ukrainians pursuant to a single personnel transfer order.[20] *Id.* at 347, 352.

---

at Auschwitz I, not Auschwitz II–Birkenau. *Breyer*, 2002 WL 31086985, at *8. He testified he had told his superiors, in front of a group of roughly 100 men, that he could not shoot someone, and maintained he had been assigned only outside perimeter guarding and had never been required to unload train passengers. *Id.* at *7, *9. At this proceeding he admitted he had been aware that large scale murder was transpiring at Auschwitz, but said he deserted the S.S., after a short period of service, in August 1944. *Id.* at *9–10. He claimed he had stayed in his hometown until January 1945, when it was evacuated in anticipation of the advancing Allied forces. *Id.* at *10. Breyer claimed he had never been able to transfer out of the Death's Head unit to a combat unit because transfer was "out of the question completely." *Id.* at *9.

The German authorities dispute four of these points, and contend they are inconsistent with Breyer's previous statements and the historical record. First, the German authorities dispute Breyer's testimony that he served at Auschwitz I, and not Auschwitz II–Birkenau, based on three inconsistencies. First, they claim that, in his 1991 deposition, Breyer described the watchtowers he stood in as open, while the German authorities note the only open watchtowers in Auschwitz were the ones located directly around the unloading ramp in Auschwitz II–Birkenau. War. at 153. Second, they point out that, in his 1991 deposition, Breyer described working near S.S. guards with dogs, while the only canine unit in Auschwitz was in Auschwitz II–Birkenau. *Id.* Finally, Breyer described how the railroad tracks where he worked extended all the way into the camp; Auschwitz II–Birkenau was the only camp at Auschwitz set up in this manner. *Id.*

The German authorities dispute Breyer's testimony that he deserted the S.S. based on three inconsistencies. First, they note his testimony and the corroborating documentary evidence show he was home on leave in April 1944 and mid-January 1945. *Id.* at 154. They point out that, with the S.S.'s policies on leave, it was highly unlikely that he was at home any other time in between—i.e., since he re-joined the S.S. after helping his parents evacuate Slovakia in January 1945, he had no time to go on leave and desert the S.S. like he claimed. *Id.* Second, Dr. Hordler points out that Breyer's name is not on a list of men who had deserted Auschwitz as of February 1945. *Id.* at 347. Finally, Dr. Hordler flatly disputes Breyer's claims of deserting the S.S. and later returning to service because the "penalty for desertion was death." *Id.* at 380.

The German authorities also dispute Breyer's testimony regarding his treatment by the S.S.—that he was only transferred to Auschwitz as punishment, and that he was assigned outer perimeter duty almost exclusively because of his principled stance that he would not shoot a prisoner. Dr. Hordler disputes Breyer's testimony that he refused to shoot anyone, because "every non-acceptance of the guard orders had compulsory, disciplinary consequences and/or led to an immediate transfer to a field unit." *Id.* at 355. He argues transfer from one concentration camp to another was not a form of punishment in the S.S.; rather, punishment would take the form of committal to an S.S. punishment camp or transfer to the front. *Id.* at 352. Dr. Hordler also contends the evidence that Breyer's cohort of ethnically German Slovaks was brought into Auschwitz to replace the cohort of ethnically German Ukrainians that had revolted specifically conflicts with Breyer's transfer story. *Id.* at 352. Finally, Dr. Hordler posits that, if Breyer was not transferred as part of the large ethnically German Slovakian cohort in July 1943, he may have requested a transfer to Auschwitz, since it was so much closer to his family's home (approximately 428 miles closer). *Id.*

20. Dr. Hordler cites numerous documents to support his timeline of Breyer's service in Auschwitz II–Birkenau. Breyer's service be-

In any event, Breyer was serving in Auschwitz's 8th Company no later than April 1944, i.e., the unit located at Auschwitz II–Birkenau, when two letters were sent .on his behalf by his local Nazi party leader, and the head of the Nazi party for all of Slovakia, both of whom supported his request to be discharged from the S.S. to assist with his family farm. Exp. Rep. at 350, 446–47 (certified translation); War. at 378. As of December 29, 1944, American counterintelligence knew Breyer was then serving in Auschwitz II–Birkenau, 7th company (formerly 3rd, 8th company). War. at 153; Exp. Rep. at 380, 453.

(1) *While Breyer served at Auschwitz II–Birkenau, Death's Head guards' duties*

*included aiding and abetting murder*

The German authorities assert Breyer, since he arrived at Auschwitz II–Birkenau in July 1943 (or even, latest, April 1944), participated in guarding the unloading ramp during "selection," and walking those that could walk to the gas chambers (or taking those that could not walk to the gas chambers by truck). War. at 143. Dr. Hordler asserts the 8th company was always responsible for guarding the camp, securing the incoming transports, and maintaining order during the selection for the gas chamber. Exp. Rep. at 347. He cites an instruction manual for Death's Head guards from July 1943, which makes

ginning February 1943 and immediate deployment to Buchenwald are documented in contemporaneous Nazi records dated November 1, 1943 and November 3, 1943. Exp. Rep. at 349. Breyer also admitted to this portion of the timeline in a 1991 affidavit given in connection with his immigration case. *Id.* at 349; *see also Breyer*, 2002 WL 31086985, at *6–7. Dr. Hordler also cites the document requesting the replacement of the Ukrainian guards with guards from Buchenwald, dated July 5, 1943, which still exists and has been located. Exp. Rep. at 369. Although Breyer's individual record from this specific time no longer exists, those of two other S.S. members, who deployed from Slovakia on the same date as Breyer, and trained at Buchenwald with Breyer, do exist, and they document that the cohort was all transferred together, pursuant to a single order cited in both of their personnel files. *Id.* at 370. In addition, one of those individuals, when asked to name other members of his Death's Head unit in 1971, named Breyer (although Breyer's name was misspelled), as well as several other members of the cohort that were transferred at this time. *Id.* at 371.

There also is another piece of documentary evidence that Breyer was serving in Auschwitz in December 1943. A December 22, 1943 holiday message from that same cohort was published in Breyer's local newspaper in Slovakia wishing family and friends seasons greetings from Auschwitz. War. at 152; Exp.

Rep. at 429 (certified translation). Finally, an alphabetical list of perpetrators at Buchenwald Concentration Camp, prepared by the U.S. investigators in 1947 for prosecution of War Crimes Group, Case 000–50–9, includes Breyer's name and date of birth, and notes that his whereabouts were at that time unknown. Exp. Rep. at 352; 454–55. On this list, his name is listed among the other ethnically German Slovakian men who began their service with him on February 10, 1943, and transferred to Auschwitz II–Birkenau in July 1943, that same cohort. *Id.* at 352. Although additional original S.S. administration documents about his service may not be available now, this list is evidence that they were available in 1947, and that they included his name.

Breyer contends that the German government's acknowledgement that he served in Buchenwald, but its failure to indict him for murders there, shows that he did not harm anyone while serving at that camp. Resp. at 6. This deduction ignores the timeline of service set forth by the German authorities: Breyer spent six weeks training at Buchenwald and was transferred to Auschwitz shortly afterwards, in July 1943. Exp. Rep. at 347. It is equally probable that the German authorities did not find it worthwhile to charge Breyer for his short-term work at Buchenwald as well. Thus, at this stage of the proceeding, Germany's evidence is sufficient to establish probable cause. The validity of Breyer's interpretation is reserved for trial.

it clear that all guards were required to use firearms. *Id.* at 354. Dr. Hordler also describes a picture book, which uses graphics to show exactly how to "unload a prisoner transport." *Id.* at 355. Finally, the German prosecutor notes regulations regarding supervision of guards and prisoners as well as training of S.S. guards in the National socialist ideology are well-documented from previous prosecutions.[21] War. at 151.

Dr. Hordler also cites information received from other former Death's Head guards. A former platoon commander for the 8th Company, Hans Schillhorn, who received a War Merit Cross, II Class, with swords, for his service in Auschwitz II–Birkenau, explained in a mid-March 1962 interrogation that "ramp duty"—i.e. guarding the ramp where train passengers were unloaded and "selected" for work duty or death—required a group of men, and that this duty was assigned via a conventional rotation system, whereby all S.S. members were on guard duty, on alert standby, or off duty. Exp. Rep. at 371–72. Schillhorn confirmed all S.S. guards at Auschwitz II–Birkenau were assigned ramp duty, and everyone who participated knew they were accompanying people to gas chambers, which was "discernible simply by smell." *Id.* at 372.

Breyer received a promotion while working at Auschwitz.[22] Exp. Rep. at 378. Dr. Hordler surmises Breyer received his promotion to private first class on May 1, 1944, skipping the rank of senior private entirely, along with the bulk of his cohort of ethnically German Slovakians with whom he had joined the S.S., trained at Buchenwald, and been transferred to Auschwitz. Exp. Rep. at 378. The German prosecutor argues that, as the number of prisoners selected for death increased, and the number of forced laborers decreased, there were certainly no Death's Head guards responsible only for guarding the outside of the camp or guarding from the watchtowers. Heindl Decl. at 80. Dr. Hordler adds that, while there were severe punishments for not following regulations regarding guard duty, guards could always volunteer to transfer to the front. Exp. Rep. at 357. Accordingly, the Extradition Request sets forth sufficient circumstantial evidence to establish probable cause that Breyer's work at Auschwitz II–Birkenau, which included aiding and abetting murder, was satisfactory.

(2) *Breyer served at Auschwitz II–Birkenau during its busiest historical time, when it would have been impossible for any Death's Head guard not to aid and abet murder*

More than 200,000 Hungarian Jews were gassed to death at Auschwitz II–Birkenau in the summer of 1944. War. at 154; Berenbaum at 174 (stating that over 400,000 Hungarian Jews were killed). These murders have been investigated in the context of other prosecutions in Germany.[23] *Id.* at 154–55. The deaths were

---

21. Dr. Hordler lists several specific ideological seminars that were required training at Auschwitz during Breyer's tenure: "Volksdeutsche [i.e. ethnically German citizens of other countries]—Reich German" (January 12, 1944), "Fighting Partisans in the Balkans" (February 15, 1944), "Ethnic 'Germandom' in the Reich German Community" (February 28, 1944), and "Vengeance," during the Hungarian Action. Exp. Rep. at 359.

22. The fact that Breyer received a promotion is documented in the file card from the United States Army's Counter–Intelligence Corps about him, which lists his rank as private first class. Exp. Rep. at 378, 453.

23. According to German authorities, the specific numbers of individuals killed are documented by four sources: (1) concurrent reports made by the Nazis in Hungary to their superiors in Germany dated June 13, 1944, June 30, 1944, and July 11, 1944, which spec-

generally known to all the guards at the concentration camps, and were discussed at Auschwitz.[24] *Id.* at 156.

Dr. Hordler argues that, during the Hungarian Action, the 8th Company's role in securing the transports was critical. Exp. Rep. at 347. He painstakingly documents the changes in organizational structure made to accommodate the Hungarian Action. *Id.* at 362–64. Rudolph Hoss served as Auschwitz's original commandant, or top officer in charge of all operations, and was so closely associated with the Hungarian Action that it was sometimes referred to as "Action Hoss." *Id.* at 362; Berenbaum at 174. Hoss served as the commandant for all of Auschwitz concentration camp as well as the S.S. Garrison Commander, i.e. the officer in charge of all Death's Head guards' discipline, from May 1940 until November 1943. Exp. Rep. at 362. In November 1943, Hoss transferred to become a Department Head, and his former duties were split between others. *Id.*

In May 1944, however, a time period that coincides with preparation for the Hungarian Action, Hoss' former disciplinary responsibilities as S.S. Garrison Commander were returned to him, temporarily. *Id.* at 362–63. Hoss also brought in several specialists, with experience in extermination procedures from other concentration camps, to assist in the Hungarian Action. *Id.* at 363. Hoss himself supervised digging pits alongside Crematorium V and Bunker II, Otto Moll was brought in as temporary chief of all gas chambers and crematoria, and Erich Mubfeldt and Robert Seitz were brought in from Lublin to take command of Crematoria II and III, and IV and V, respectively, and to show other Death's Head guards how to effectively incinerate bodies in open pits. *Id.* at 363.

It was against this backdrop that Breyer and his cohort received two-degree promotions on May 1, 1944, right before the beginning of the Hungarian Action, when the Nazi supervisors knew they would need all S.S. guards to murder hundreds of thousands of people in a matter of weeks. *Id.* at 378. And it was under Hoss' renewed, temporary command that the men of the 7th and 8th companies at Auschwitz II–Birkenau signed a declaration of commitment, swearing to use their "entire person[s]" to effect the extermination and to keep quiet about it on May 20, 1944. *Id.* at 379. A series of awards were given to several S.S. guards on July 20, 1944, just after the Hungarian Action. *Id.* These men were infamous for their service in the gas chambers and were stationed in Auschwitz I, II, and III at this time. *Id.* German authorities allege that, in this time period, there was no opportunity for any Auschwitz Death's Head guard to avoid aiding and abetting mass murder.

Dr. Hordler shows that several potential revolt and/or mass escape attempts during Breyer's tenure at Auschwitz also required all Death's Head guards to be on alert and

ify the dates trains left Hungary, and the number of passengers aboard each train (War. at 154); (2) contemporaneous records made by prisoners (*id.* at 155); (3) contemporaneous records of railroad officials for train stations along the trains' path (*id.*); and (4) contemporaneous records from the ghettoes from which the Jews were deported in Hungary (*id.*). To determine the number of prisoners sent to the gas chambers, the German prosecutor discounts the total number of pris-

oners sent from Hungary to Auschwitz by approximately one-third, to account for those that died during transport or were selected for death by forced labor. Heindl Decl. at 76.

24. The government asserts this has been established by witness testimony of former S.S. guards in previous prosecutions. War. at 156.

on duty.[25] *Id.* at 373. On October 23, 1943, some women recently transported from Bergen–Belsen rebelled, injuring two S.S. guards. *Id.* at 373. A day later, dozens of prisoners attempted a mass escape, and were thwarted largely by S.S. guards shooting from the watchtowers. *Id.* at 373–74. Later that month, two S.S. guards were given the War Merit Cross, Class II, for assisting to suppress this October "mutiny." *Id.* at 373. Dr. Hordler also documents the prisoner uprising in Auschwitz II–Birkenau on October 7, 1944, which disabled Crematorium IV and resulted in the death of approximately 900 prisoners, 200 of whom were shot by the S.S. in the yard of Crematorium IV after being captured. *Id.* at 380 (citing witness statements from previous investigations).

c) *Even if Breyer was stationed at Auschwitz I, he aided and abetted murder*

Dr. Hordler summarizes 1960 testimony of a squad leader from Auschwitz II–Birkenau's 6th Company, which was housed in wooden barracks outside of Auschwitz II–Birkenau itself, in between Auschwitz I and II. Exp. Rep. at 374. Dr. Hordler explains that, before the train tracks leading all the way into Auschwitz II–Birkenau and the ramp were finished in the spring of 1944, the transports would be unloaded only at night, in between Auschwitz I and II, illuminated by spotlight, making unloading visible from Auschwitz I. *Id.* This testimony was corroborated by 1961 testimony from a driver in Auschwitz's Motor Pool Alert Standby unit. *Id.* at 376.

According to the squad leader, it was common knowledge that those determined to be unfit for work would be taken to the crematorium for gassing. *Id.* at 374. That same squad leader was given an award on July 20, 1944, immediately after the end of the "Hungarian Action," alongside several other men from all three Auschwitz camps, demonstrating all Death's Head guards participated in that extreme period of mass murder, regardless of camp assignment. *Id.* at 375. The man named as a witness to that particular squad leader's valorous conduct during the Hungarian Action served in the 8th Company—with Breyer. *Id.*

d) *Even crediting only Breyer's 2002 admissions and historical information about the operation of the camps, there is probable cause to establish that he "aided and abetted" murder*

In addition to the above information showing that all Auschwitz Death's Head guards during the 1943–44 time period actively participated in gassing people to death, there is extensive information that forced labor was just another method to kill prisoners. War. at 132; Grunberger at 85; Berenbaum at 168 (Wannsee protocol). In his 2002 immigration case testimony, Breyer admitted he worked at Auschwitz I during 1944, and twice took groups of prisoners to construction sites for work. *Breyer,* 2002 WL 31086985, *8–9. Although the government has presented substantial information that suggests this greatly understates Breyer's likely contribution to the extermination of the Jews it is, by itself, enough to constitute probable cause that Breyer, at a minimum, aided and abetted the Nazis' policy of "extermination through work."

---

**25.** Dr. Hordler further cites contemporaneous documentation regarding the particularly busy period of October 1943, in which an additional company was needed at Auschwitz II–Birkenau to assist with a 1,000–person transport of Roman Jews and an 1,800–person transport of Jews from Bergen–Belsen, most of whom were murdered immediately. *Id.* at 373.

### C. *Breyer's Arguments Against Probable Cause*

Breyer argues the government has failed to establish probable cause that he aided and abetted murder during his S.S. service in Auschwitz because: 1) I am precluded from finding probable cause to believe that he voluntarily aided and abetted murder based on the 2002 court determination that his service in the S.S. after the age of 18 was involuntary; and 2) there is no specific evidence that he personally killed any prisoners, and his mere presence at the site of criminal activity is legally insufficient to establish probable cause. Resp. at 9.

#### 1. *Voluntariness*

Breyer notes that voluntary action is a required element of aiding and abetting murder in Germany, and argues the Request for Extradition fails to establish probable cause as to that element because his service in the S.S. was already determined to be involuntary by the United States District Court for the Eastern District of Pennsylvania in 2002. Resp. at 12 (citing German Criminal Code § 27 and *Breyer*, 2002 WL 31086985, at *15).

■ The 2002 determination was made in the context of an immigration case, and the Court sought only to determine whether Breyer's S.S. service qualified as an "expatriating act" that could result in the loss of his citizenship. *Breyer*, 2002 WL 31086985, at *1. Findings in a civil immigration context, however, do not control a criminal probable cause determination, especially when Germany has offered new evidence.[26] *Hamilton*, 322 F.3d at 787 ("Reconsideration of a previously decided issue may . . . be appropriate . . . when the record contains new evidence").

Germany does not suggest that mere membership in the S.S. constituted aiding and abetting murder, only that service as an armed guard in the death camps violated German law. *See* Heindl Decl. at 68. As Germany alleges, Breyer's decision to remain in the concentration camps, assisting in the execution of hundreds of thousands of innocent civilians, was voluntary because he could have requested—and would likely have received—a transfer to a more traditional military unit at any time. Exp. Rep. at 347–48, 381.

The German Request sets forth three pieces of evidence to substantiate its claim that Breyer had the option to transfer out of the Death's Head guard at any time. First, Dr. Hordler cites an August 22, 1944 Special Order encouraging S.S. men to join the front. *Id.* at 381. Second, Dr. Hordler documents 500 S.S. men, who were serving at Auschwitz in September 1944 and transferred to other units at that time. *Id.* at 347. Finally, Dr. Hordler cites statements by Himmler, the head of the S.S., encouraging S.S. guards to transfer to fighting units, to rejuvenate the forces at the front. *Id.* at 348. This constitutes probable cause to believe that Breyer had options to continue his S.S. service, after his eighteenth birthday, in a way that comported with the law, and voluntarily chose to work at the concentration camps instead.

#### 2. *Presence*

Breyer also contends the German Request fails to set forth probable cause to believe he aided and abetted murder because it establishes only his membership in the S.S. and presence at Auschwitz, and

---

26. The Court determined that Breyer's enrollment in the S.S. was voluntary as a matter of fact, but that, because it had been undertaken before his 18th birthday, it was involuntary as a matter of immigration law. *Id.* at *14. The Court further found that "remaining in the Waffen S.S. after he was 18 years of age was not a voluntary act (a finding which would seem to be corroborated by common sense)." *Id.* at *15.

does not cite any eye-witness testimony regarding his personal activities. Resp. at 15. He argues that mere membership in an organization or "presence at the location of illegal activity" is insufficient to establish probable cause, and cites supporting cases. *Id.*

.The cases are easily distinguished. · In *Wright v. Cuyler,* 563 F.2d 627, 630 (3d Cir.1977), the Court described an earlier decision finding a lack of probable cause to arrest gang members who were suspected solely on the basis of their gang membership because there was no evidence of their presence at the site where the murders occurred. Here, however, Germany has set forth extensive evidence regarding Breyer's presence at Auschwitz as a guard processing Jews for wholesale slaughter. In two of the cases Breyer cites, the courts found probable cause. *See United States v. Lampkin,* 464 F.2d 1093, 1097 (3d Cir. 1972); *Williams v. Atlantic City Dept. of Police,* No. 08–4900, 2010 WL 2265215, *5 (D.N.J. June 2, 2010). Breyer's final case, *United States v. Van Scoy,* 654 F.2d 257, 266–67 (3d Cir.1981), addresses only jury instructions, and is inapplicable here.

In his brief, Breyer admits "that he was stationed at Auschwitz," but claims he "had no knowledge of what occurred there." Resp. at 16. He also admits "that he escorted prisoners to construction sites," but contends that "these escorts were rare and Mr. Breyer never harmed any of these prisoners." *Id.* Even assuming Breyer· participated only minimally when he served as a Death's Head guard at Auschwitz, the Request for Extradition sets forth ample probable cause to believe that his service as an armed guard at a genocidal death camp constitutes aiding and abetting murder.

## V. *CONCLUSION*

Having carefully reviewed the evidence presented, and considering the arguments of both counsel, the request should be granted and I find:

1. I am authorized under Title 18, United States Code, Section 3184, to conduct an extradition hearing.

2. Johann (John) Breyer currently resides at 9403 Woodbridge Road, in Philadelphia, within the Eastern Judicial District of Pennsylvania.

3. I have personal jurisdiction over Johann (John) Breyer, and subject matter jurisdiction over the case.

4. There is currently in force an extradition treaty between the Government of the United States and the Republic of Germany. The treaty was signed on June 20, 1978, and entered into force August 29, 1980; it was then supplemented by a treaty signed on October 21, 1986, and entered into force March 11, 1993, and again by a treaty signed on April 18, 2006, and entered into force February 1, 2010.

5. A warrant for Breyer's arrest was issued on June 17, 2013.

6. Germany seeks Breyer's extradition so that he can be tried for aiding and abetting murder.

7. The murder charges pending against Breyer in Germany are encompassed by Article II of the extradition treaty because they are punishable under the laws of the United States and Germany by a term of imprisonment which exceeds one year.

8. The Embassy of the Federal Republic of Germany has submitted Diplomatic Note number 104/13 dated July 31, 2013, as supplemented by Diplomatic Note number 114/13, dated August 26, 2013, and Diplomatic Note number 91/14, dat-

ed June 3, 2014, requesting the extradition of Johann (John) Breyer, in compliance with the 1978 Treaty, as amended by the 1986 Supplementary Treaty and 2006 Second Supplementary Treaty.

9. In compliance with Article 29 of the 1978 Treaty, as amended by Article 6 of the 2006 Second Supplemental Treaty, the documents in support of that request submitted by the United States government on behalf of the Federal Republic of Germany are properly authenticated, as they bear the appropriate seals.

10. There is probable cause to believe that Breyer, the individual before this Court, is the same person sought for aiding and abetting murder in Germany.

11. The government has presented evidence sufficient to establish probable cause to believe Breyer committed the crimes named in the warrant against him.

Based on the foregoing findings, Johann (John) Breyer is subject to extradition and surrender for the murder charges pending against him in Germany, and this finding is certified to the Secretary of State as required under Title 18, United States Code, Section 3184.

IT IS THEREFORE ORDERED, on this 23rd day of July, that a certified copy of this Certification of Extraditability and Order of Commitment be forwarded without delay by the Clerk to the Department of State, to the attention of the Office of the Legal Adviser;

AND IT IS FURTHER ORDERED that Johann (John) Breyer shall abide by all conditions of his bail pending final disposition of this matter by the Secretary of State and surrender to designated agents of the Government of Germany.[27]

**27.** On June 18, 2014, Breyer requested bail pending extradition on the basis of his age and health conditions. *See* audio record of 6/18/14 hearing (doc. 6), Motion for Reconsideration of Bail (doc. 13), and Response thereto (doc. 14). His age and the cited physical infirmities were not adequate to constitute the "special circumstances" required to merit bail pending extradition, since Breyer was receiving no at-home medical care and was arrested early in the evening upon his return from a shopping excursion with his wife. *In re Rouvier*, 839 F.Supp. 537, 542 (N.D.Ill. 1993) (citing 9th Circuit case holding that, to avoid incarceration, a medical condition must be so serious that "no constitutionally acceptable treatment can be provided" in prison); *accord Extradition of Hamilton–Byrne*, 831 F.Supp. 287, 291 (S.D.N.Y.1993).

At least one court has considered health concerns, in conjunction with a weak underlying case, in granting bail. *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514 (S.D.Tex. June 23, 2008). Without deciding whether the strength of an underlying request for extradition is an appropriate consideration in determining whether "special circumstances" exist, I note that the case presented against Breyer rises well above that described in *Huerta*. *See, supra,* at § IV.B.3.d. (noting the strength of the case against Breyer based solely on admissions made under oath).

On July 8, 2014, I denied a renewed request for bail, but invited Defendant to request an expedited hearing date instead of the August 21, 2014 schedule he had sought in June. Order of July 8, 2014 (doc. 17). On July 19, 2014, Breyer's medical condition changed and he required emergency hospitalization. In light of this development, I found that he had established "special circumstances" and granted him bail pending final determination of the request for his extradition. *See* July 21, 2014 Order, (doc. 21).